**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **HARFORD COUNTY BRANCH of the NAACP, et al.,** | * | |
| | * | |
| *Plaintiffs*, | | |
| | * | **Civil Case No.: 1:26-cv-00239-JMC** |
| v. | | |
| | * | |
| **SHERIFF JEFFERY GAHLER, et al.** | | |
| | * | |
| *Defendants*. | | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs, Harford County Branch of the NAACP and Charles Morris, initiated the present lawsuit on January 20, 2026, against Harford County, Maryland ("Harford County"), the State of Maryland, Sheriff Jeffrey Gahler, and Warden Daniel Galbraith alleging violations of 42 U.S.C. § 1983, the Maryland Declaration of Rights, the Fourteenth Amendment (Count I); the Americans with Disabilities Act, 42 U.S.C. §12131 (the "ADA") (Count II); and Section 504 of the Rehabilitation Act (Count III). (ECF No. 1). Before the Court are several motions: (1) Defendant Harford County's Motion to Dismiss (ECF No. 36); (2) Defendant State of Maryland's Motion to Dismiss (ECF No. 42); (3) Defendant Gahler's and Defendant Galbraith's Motion to Dismiss (ECF No. 43); and (4) Plaintiffs' Motion to Strike Harford County's reliance on two affidavits (ECF No. 60). The motions are fully briefed (ECF Nos. 36, 42, 43, 44, 53, 54, 55, 60, 63, 65, 67, 68) and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons that follow, Defendant Harford County's Motion to Dismiss will be GRANTED; Defendant State of Maryland's Motion to Dismiss will be GRANTED in part and DENIED in part; Defendant Gahler's and Defendant Galbraith's Motion to Dismiss will be GRANTED in part and DENIED in part; and Plaintiffs' Motion to Strike, construed as an objection, will be GRANTED.

## I.   BACKGROUND

The present lawsuit arises a suicide attempt rate at Harford County Detention Center ("HCDC") that is allegedly "more than five times the national average." (ECF No. 1 at 2).[1] Plaintiffs assert that this rate is further "compounded by dozens of recent, preventable suicide attempts." *Id.* They urge that "Defendants improperly dismiss this deadly crisis as beyond their control." *Id.* For example, Plaintiffs allege Defendant Galbraith, who is HCDC's warden, said "[i]f somebody wants to kill themselves, they're determined and they've made their mind up, they're going to find a way." *Id.* Plaintiffs brought the instant litigation to challenge such a notion, asserting "[p]eople contemplating suicide 'are ambivalent about living, not intent on dying'" and often suffer from various mental health disabilities that result in such ideation. *See id.* (quoting HARFORD COUNTY DETENTION CENTER SUICIDE PREVENTION AND CRISIS INTERVENTION MANUAL, 4).

### i.   The Parties

Plaintiff NAACP ("Plaintiff NAACP" or "NAACP") is a non-profit, non-partisan organization. *Id.* at 5. "The Harford County branch was started in 1920. It has 330 members who play an active role in deciding its leadership every two years in November by voting to elect the branch's president and other members of its executive committee." They allege that through the years, NAACP "has sought lifesaving reforms at HCDC for itself and its members." *Id.* at 4. Yet, "[d]espite deadly tragedies, extensive media coverage spreading the alarm, and many warnings from Plaintiffs and others urging action, Defendants maintain callous and deliberate indifference

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. If there are none, the Court is referring to the page number of the PDF.

to the risks and needs of those in their care, often putting more effort into defending their track record and minimizing the harms." *Id.*

They allege that this litigation "is central to the NAACP's mission and purpose," which includes "securing the political, educational, social and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons." *Id.* They further allege that addressing "health and incarceration-related disparities, especially for Black and other communities of color or other marginalized groups, is a hallmark of the NAACP locally and nationally." *Id.* They state that in 2022, the NAACP adopted a national resolution titled "In-Custody Deaths – Incarcerated Residents Constitutional Protections Recovery" that "focused on remedying process failures and neglect in prisons and jails." *Id.* The allegations continue by asserting the basis for organizational and associational standing, which is not presently in dispute. *Id.* at 6-7.

Plaintiff Charles Morris ("Plaintiff Morris" or "Mr. Morris") is a Harford County resident who allegedly attempted suicide at HCDC. *Id.* at 7. Plaintiffs assert that Mr. Morris is a member of the NAACP who is diagnosed "with both major depressive and bipolar disorders, as well as a serious seizure disorder." *Id.* at 7.

Defendant Jeffrey Gahler ("Defendant Gahler" or "Sheriff Gahler") is the Sheriff for Harford County "and, in this capacity, is an agent of Harford County and the state of Maryland." *Id.* "At all relevant times, Sheriff Gahler was an official with final decision-making authority and control over HCDC and the Sheriff's Department." *Id.* Plaintiffs allege that Sheriff Gahler is "directly responsible for (a) HCDC and Sheriff's Department policies; (b) the care and custody of persons detained at HCDC; and (c) the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents." *Id.*

Defendant Daniel Galbraith ("Defendant Galbraith" or "Warden Galbraith") is the Warden of HCDC who "is directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents, and for the care and custody of persons confined at HCDC." *Id.* at 8.

Plaintiffs have also brought suit against Defendants Harford County and the State of Maryland. *See id.*

<div align="center">

*ii.*     <u>Mr. Morris's Suicide Attempt</u>

</div>

Plaintiffs support their claims against each Defendant with the allegations arising from Plaintiff Morris's suicide attempt while in custody at HCDC. *Id.* at 2. They allege that although Plaintiff Morris survived a suicide-by-hanging attempt, HCDC "ignored red flags noted in their own written policies, including Mr. Morris's tearful confession that he did not see a reason for living, his diagnoses of major depression and bipolar disorder, and his seizure disorder." *Id.* During screening, at around 9:50 a.m., "Mr. Morris presented clear warnings of crisis, vulnerability to self-harm, and psychiatric disabilities." *Id.* at 24. Plaintiffs cite as an example that Mr. Morris "had recently been at a residential substance use program." *Id.* "His mother, with whom he lived and for whom he had been a long-term caregiver, recently died." *Id.* HCDC staff notes reflected that he appeared anxious, visibly depressed, and tearful. *Id.* However, Plaintiffs assert that despite a screening interview in which Mr. Morris shared these life events, HCDC staff failed to flag Mr. Morris for special housing, monitoring, or medical attention. *Id.* Instead, they assert that staff referred Mr. Morris for a follow up mental health visit. *Id.* at 24-25. Then, HCDC "locked Mr. Morris in a solitary cell for 23 hours a day, with a bunk bed practically purpose-built for suicide attempts." *Id.* at 2-3. Plaintiff Morris "tied a noose from his pants and attached it to his upper bunk, stood on his lower bunk, and jumped off." *Id.* at 24. They assert that "like others before him, he hung himself" before jail staff found him after "hanging for several minutes and…not

breathing." *Id.* at 3. Plaintiff Morris "was rushed to Bayview Hospital in Baltimore, where he spent a week fighting for his life." *Id.*

Following Plaintiff Morris's alleged suicide attempt, Plaintiffs aver that "Defendants then sought to cover up the incident to prevent Mr. Morris's family from discovering HCDC's malfeasance, insisting no family be notified and that Mr. Morris remain alone with no loved ones to support him or assist in any medical decision-making as he lay near death, hospitalized in a coma." *Id.* They allege "Defendants directed hospital staff that Mr. Morris's family would be *only* notified of his devastating injuries if he became brain dead." *Id.* (emphasis in original). At the time of filing the Complaint, Plaintiffs allege Mr. Morris was the "latest victim of HCDC's lethal pattern and practice of deliberate indifference, including Defendants' malign insistence on maintaining practices that exacerbate—and even encourage—the risk of suicide attempts, their refusal to take rudimentary precautions, and their *de facto* punishment of survivors." *Id.*

### iii.    Defendants' Alleged Failures at HCDC

Plaintiffs allege several practices exacerbate or encourage suicide attempts. *Id.* Those include,

> a. HCDC routinely fails to adequately assess suicide risk, regularly failing to identify people in significant jeopardy, e.g., people experiencing severe withdrawal or with well-documented serious mental health needs.

> b. Although isolation severely aggravates the risk of distress and self-harm, the jail defaults to locking people in 23-hour-per-day solitary confinement upon arrival.

> c. Flouting basic standards of care, HCDC keeps people in solitary even after determining they are suicidal, without anything remotely adequate by way of monitoring, therapeutic care, or re-evaluation.

> d. Although hanging is the leading cause of death in jails, including HCDC, the jail uses cells with superfluous bunks that serve as makeshift gallows.

> e. HCDC's responses to suicide attempts often are unnecessarily punitive and involve excessive force, effectively punishing people for attempting suicide.

f. To cover up their wrongdoing, Defendants falsify records, withhold information from families, and preclude families from accessing and supporting their loved ones, while publicly proclaiming the jail blameless.

g. HCDC's "suicide watch" is so deficient that people have been able to rehearse their suicide attempts or even die while supposedly under observation.

*Id.* at 3-4. Stated differently, they alleged that "HCDC receives people like Mr. Morris who are vulnerable to self-harm, often presenting with psychiatric or other disabilities" and engages in deficient practices "that miss obvious warning signs" and fail to properly house or monitor those inmates, thereby making preventable suicide attempts a reality. *Id.* at 4.

HCDC's written polices state, "[c]orrectional officers are responsible for preventing suicides–both legally and morally... Management and prevention of suicide is a critical area in which the correctional officer can be the difference between life and death." *Id.* at 9.  Plaintiffs allege that Defendants fail to comply with the HCDC manual and engage in deficient screening, monitoring, and treatment. *See id.*  "Because the vast majority of suicides and attempts in jails are committed by pretrial detainees within the first seven days of their booking, effective initial screenings and monitoring are vital." *Id.*  They continue, "people arrive at jail in crisis, facing new and acute stressors, including profound shame, frightening criminal charges, loss of freedom, and sudden isolation from friends, family, and support systems." *Id.* Plaintiffs assert that these individuals "are disproportionately likely to be intoxicated or experiencing withdrawal from narcotics or alcohol, to have histories of mental illness or psychiatric disabilities, and to have missed their prescribed medications for mental health and other ailments, all of which increase suicide risk." *Id.*  However, instead of "engaging in any kind of meaningful evaluation, monitoring or treatment," they state that "HCDC officials regularly wait until a person is either actively self-harming, or announces a specific intent to commit self-harm, before flagging the person as at-risk, flouting basic standards of care and their own policies." *Id.*  at 10.

Plaintiffs next allege that HCDC and its officials engage in excessive reliance on isolation and solitary confinement, thereby "increas[ing] feelings of hopelessness and suicide risk." Plaintiffs rely on the National Study of Jail Suicides,[2] which states "that two out of every three people who committed suicide in jail were being held in isolation." *Id.* Next relying on HCDC's suicide and crisis prevention manual, Plaintiffs allege that "if a correctional officer believes an inmate is suicidal," the C.O. should not "[p]lace the inmate in isolation, even if the inmate is unruly or abusive, unless a special watch of continuous staff observation is initiated." That notwithstanding, Plaintiffs assert that HCDC officials "routinely place[] newly detained individuals in solitary confinement" for "23 hours a day, precisely when they are at the greatest risk for suicide" and "[use] housing policies that invite solitary confinement as a knee-jerk response to nearly every kind of medical, mental health or other special need." *Id.*

Third, Plaintiffs challenge alleged deficient monitoring practices "even for those identified as needing suicide or medical observation." *Id.* "Even when the jail does place people on suicide watch (or other medical observation), any monitoring and mental health care has often been so egregiously inadequate that people end up hurting themselves or dying anyway." *Id.* (emphasis omitted). To that end, Plaintiffs assert that experts recognize remote surveillance alone as an inadequate means by which to monitor people who are suicidal. *See id.* "Cameras may supplement, but do not substitute for, human contact, connection, and direct observation." *Id.* at 10-11. Similarly, they allege "[video surveillance] as an alternative to staff observation is not supported by national correctional standards … Despite its intended use, [video surveillance] does not prevent a suicide, it only records a suicide attempt in progress." However, Plaintiffs assert that

---

[2] Lindsay M. Hayes and Joseph R. Rowan, *National Study of Jail Suicides: Seven Years Later*, JAIL SUICIDE PREVENTION INFORMATION TASK FORCE: NATIONAL CENTER ON INSTITUTIONS AND ALTERNATIVES, 2 (Feb. 1988), https://www.prisonlegalnews.org/media/publications/hayes_and_rowan_jail_suicide_prevention_information_task_force_national_study_of_jail_suicides_1988.pdf.

"HCDC routinely relies on cameras instead of human monitoring" to such an extent that those placed on suicide watch or medical observation "are essentially left unmonitored." *Id.* at 11.

Fourth, Plaintiffs assert that hanging "is the top risk for jail suicide." *Id.* As such, they state that "unnecessary protrusions that can be used for hanging" should be removed from cells. *Id.* However, Plaintiffs allege that HCDC uses bedframes with protrusions that create an obvious hanging risk that HCDC officials fail to address. *Id.* Specifically, they assert the protrusions shown on a photo of cell-bed below are "practically built for suicides. *Id.* at 12. The photo depicts a bunkbed with an additional rod extending above the top bunk at the head and foot of the bed. *See id.* They also allege that rather than responding to signs of a suicide risk, HCDC's "suicide watch" "often involves putting people in solitary confinement cells on the restrictive housing unit or so-called "medical" cells in the detention center basement, removing all their property and clothing, and then putting them on some form of camera surveillance." *Id.* at 12. "At HCDC, conditions of 'suicide watch' are so extreme and unmitigated by any therapeutic response that they are more punitive even than disciplinary segregation." *Id.* For example,

> Defendants routinely strip people of their clothing, pinning them down and literally cutting the clothing from their bodies or forcing them to undress in front of multiple officials; strip them of all personal possessions, denuding their cells and leaving some with nothing but a mattress; deny them any human contact, confining them in solitary monitored by video (rather than face-to-face), and often precluding family members from seeing or contacting them; and in some instances, handcuff or even strap suicidal people into restraint chairs that completely immobilize them.

*Id.* at 12-13.

Plaintiffs trace the alleged pattern of disregard for suicide risk back to 2019. Those allegations describe in detail the tragic suicide attempts, many of which were successful, of Mr. Maryln Barnes, Mr. Thomas Pardew, Mr. Randy Gisiner, Mr. Jack Lazar, Mr. Nathaniel Powell, Sr., Ms. Brittani Ugrotzi, and thirteen other unnamed men, spanning from 2019 to 2024. *See id.* at 14-23. Of those who survived, Plaintiffs describe HCDC's approach to putting those individuals

in solitary confinement or using other restrictive measures to prevent them from engaging in self-harm, including allegations describing Mr. Morris's post-suicide attempt treatment as an example. *See generally id.* Taking all of the above together, Plaintiffs allege violations of the Fourteenth Amendment, 42 U.S.C. § 1983, and Articles 19 and 24 of the Maryland Declaration of Rights based on alleged deliberate indifference to unconstitutional conditions of confinement exacerbating risk of suicide and serious medical needs against all Defendants. Against the State of Maryland and Harford County, Plaintiffs assert additional claims for violations of the ADA and Rehabilitation Act based on the acts and omissions in connection to Mr. Morris.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss Under Rule 12(b)(1)

"A federal court generally may not rule on the merits of a case without first determining that it has subject matter jurisdiction." *Scapes v. McKimm*, No. CIV WDQ-09-2231, 2009 WL 4726613, at *1 (D. Md. Dec. 1, 2009). "A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint." *Foster v. Howard Cmty. Coll.*, No. CIV.A. RDB-13-1395, 2014 WL 758027, at *1 (D. Md. Feb. 24, 2014). "This challenge under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Id.* (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). Defects in subject matter jurisdiction cannot be waived or consented to. *Roche v. Lincoln Prop. Co.*, 373 F.3d 610, 621 (4th Cir. 2004), *rev'd on other grounds*, 546 U.S. 81 (2005); *State v. Ivory*, 906 F.2d 999, 1001 n.2 (4th Cir. 1990).

State sovereign immunity provides that "a state may not be sued by a private citizen absent its consent . . . ." *Dennard v. Towson Univ.*, 62 F. Supp. 3d 446, 450 (D. Md. 2014); *see alo Effland v. Balt. Police Dep't*, No. 1:20-cv-3503-CCB, 2022 WL 3107144, at *6 (D. Md. Aug. 4, 2022). Although state sovereign immunity originates in the Eleventh Amendment to the U.S. Constitution, "common law sovereign immunity 'predated' adoption of the Eleventh Amendment, which 'confirmed, rather than established, sovereign immunity as a constitutional principle.'" *Dennard*, 62 F. Supp. 3d at 450 (quoting *Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005)). When a defendant raises the defense of Eleventh Amendment sovereign immunity, the Court "reviews that defense under Federal Rule of Civil Procedure 12(b)(1)." *Krell v. Queen Anne's Cnty.*, No. CV JKB-18-637, 2018 WL 6523883, at *3 (D. Md. Dec. 12, 2018); *see also Criscione v. U.S. Nuclear Regul. Comm'n*, 493 F. Supp. 3d 423, 430 (D. Md. 2020). "[T]he burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019).

The Fourth Circuit has "noted important differences between a traditional subject matter jurisdiction analysis under Article III to the Constitution as compared to the hybrid jurisdictional analysis required by the Eleventh Amendment." *Forrest v. Balt. City, Md.: Balt. Police Dep't*, No. 1:22-CV-03220-JMC, 2023 WL 3847429, at *4 (D. Md. June 6, 2023). For instance, unlike traditional subject matter jurisdiction, Eleventh Amendment sovereign immunity may be waived by the parties and imposes no requirement on a court to raise the issue *sua sponte*. *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005). Nevertheless, the weight of authority in this District indicates that Eleventh Amendment sovereign immunity challenges are best resolved under Rule 12(b)(1) rather than Rule 12(b)(6), so the Court continues

to do so here. *See, e.g.*, *Gross v. Morgan State Univ.*, 308 F. Supp. 3d 861, 865 (D. Md. 2018) (collecting cases); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 579 n.6 (D. Md. 2021).

B.  Motion to Dismiss Under Rule 12(b)(6)

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations omitted). To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires "more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted). In considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F. Supp. 133, 136 (D. Md. 1995) (internal citations omitted). The Court must also construe the facts and reasonable inferences from the facts in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

III.    **ANALYSIS**

A.      **It is Settled that the Court Does Not Consider Matters Outside the Pleadings on Motions to Dismiss for Failure to State a Claim without Converting the Motion to One for Summary Judgment**

Plaintiff moves to strike the affidavits of Tiffany Stephens and Spencer Ebann, filed as attachments to Defendant Harford County's reply brief. (ECF Nos. 60, 63, 68).  On the basic issue of whether the Court may consider such affidavits, it is settled that "[i]f the court considers matters outside of the pleadings on a Rule 12(b)(6) motion, it shall treat the motion as one for summary judgment, to be disposed of under Rule 56, and provide all parties a 'reasonable opportunity to present all material made pertinent to such a motion.'" *Nader v. Blair*, No. WDQ-06-2890, 2007 WL 6062652, at *4 (D. Md. Sept. 27, 2007), *aff'd*, 549 F.3d 953 (4th Cir. 2008) (quoting Fed. R. Civ. P. 12(b)). Only '[u]nder limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019). "Those limited circumstances are matters of public record, documents explicitly incorporated into a complaint by reference or attached to the complaint as exhibits, or any document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Shields v. Verizon Md., LLC*, No. 1:23-CV-02932-JMC, 2024 WL 1050996, at *4 (D. Md. Mar. 11, 2024) (quotation omitted). "A document is integral to the complaint if its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021), *aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022), *and aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022) (quotation omitted).

That notwithstanding, Defendant Harford County opposes the motion to strike on the basis that Rule 12(f) applies only to pleadings.  (ECF No. 63 at 3) (citing *Dalenko v. Stephens*, 917 F. Supp. 2d 535, 541 (E.D.N.C. 2013)). The Court understands the stated defect in the procedural mechanism employed here.  Yet, review of the motion to strike makes clear that Plaintiffs seek a

remedy to address Harford County's inclusion of affidavits. (ECF No. 60). Harford County also suggests filing a motion for leave to file a sur-reply, which would require more briefing, all for the Plaintiffs to reiterate the same arguments they have already made in their Motion to Strike. (ECF No. 63 at 3). Therefore, for the sake of judicial economy, the Court finds it unnecessary to prolong the briefing process further on such a straightforward and settled matter, especially when the arguments have already been briefed and filed. Construing Plaintiff's arguments as stated in the proper form, none of the Defense's affidavits are integral to the complaint or give rise to the legal rights asserted. *Reamer*, 556 F. Supp. 3d at 549. Nor does Defendant Harford County assert as much. Rather, they argue that the motion to dismiss is meritorious "with or without the affidavits." (ECF No. 63 at 3). Therefore, the Court declines to convert the present motions to dismiss to a motion for summary judgment in order to consider the affidavits. *See Shields*, 2024 WL 1050996, at *4. The Court will GRANT the motion to strike, construed as an objection, (ECF No. 60) and shall disregard the defense's affidavits in its motion to dismiss analysis.

### B.      Defendant Harford County's Motion to Dismiss

Presently there are three claims against Defendant Harford County. (ECF No. 1). Defendant Harford County moves to dismiss those claims on several bases. (ECF No. 36-1). First, Harford County essentially makes a sweeping argument that it has no role in the regulation or practices of HCDC and therefore cannot be liable for State policies or practices as a matter of law. *See* (ECF No. 36-1 at 3). At the pleading stage, and based on the summary argument presented, the Court is unpersuaded to grant the motion on that basis. Moreover, the Court will not consider facts asserted in Defendant's brief. Second, Harford County argues that Defendants Gahler and Galbraith are state employees and any of their actions are therefore not attributable to the County with respect to each claim. *Id.* at 4. In their opposition, Plaintiffs argue the sheriff and warden are local officials under federal law. (ECF No. 44 at 4). The Court has greater concern for this second argument and

recognizes that claims involving the inner workings of a detention center and the relationship between sheriff, county, and state are fact intensive in Maryland, even in the context of federal claims. *See e.g.*, *Dotson v. Chester*, 937 F.2d 920, 926 (4th Cir. 1991); *Paulone v. City of Frederick*, 787 F.Supp.2d 360, 377 (D. Md. 2011) (discussing *Dotson's* applicability to Rehabilitation Act and ADA claims). Thus, the Court will first address the question of whether Sheriff Gahler and Warden Galbraith can be considered County employees in the context of each claim.

       1.     *The Complaint Fails to Plead a Sufficient Factual Basis to State a Plausible 42 U.S.C. § 1983 Claim*

For the purposes of Harford County's motion, it is not in dispute that Maryland law treats sheriffs as state employees rather than County employees. *See, e.g.*, *S.D. v. Abreu*, Civil Case No. 1:25-cv-2985-JMC, 2026 WL 376741, at *10 (D. Md. Feb. 1, 2026); *Boas v. Graves*, No. CV TJS-22-0979, 2024 WL 1178186, at *7 (D. Md. Mar. 19, 2024); *Brooks v. St. Charles Hotel Operating, LLC.*, No. CV DLB-23-0208, 2023 WL 6244612, at *8–9 (D. Md. Sept. 26, 2023); *Ledergerber v. Blubaugh*, No. CV JKB-20-966, 2020 WL 7029868, at *4 (D. Md. Nov. 30, 2020); *Purnell v. Converse*, No. 1:21-CV-3202-JMC, 2022 WL 17552552, at *8 (D. Md. Dec. 9, 2022); *McDonnell v. Hewitt-Angleberger*, No. CIV.A. WMN-11-3284, 2012 WL 1378636, at *4 (D. Md. Apr. 19, 2012). Indeed, Maryland courts have repeatedly dismissed county defendants "on the basis that sheriffs and deputy sheriffs are employees of the State under Maryland law." *J.A. v. Abreu*, Civil No.: 1:23-cv-02922-JRR, 2024 WL 3638023, at *4 (D. Md. Aug. 2, 2024) (collecting cases). However, Plaintiffs here argue that at the very least, their federal causes of action must survive, because as federal claims, the familiar Maryland state rule is not dispositive. (ECF No. 44 at 5). Beyond that, Plaintiffs argue that the administration of detention centers constitutes unique circumstances that are distinguishable from other cases in which sheriffs have acted as state

officials by merely carrying out their duties as officers of the state constitution.[3]  *See* (ECF No. 44 at 10-11).

In *Ledergerber*, this Court dismissed a § 1983 claim "because the events at issue involved the Sheriff's exercise of his authority as a law enforcement official, not a Harford County policy maker."  *Ledergerber*, 2020 WL 7029868, \*4.  To that end, the Court recognized that generally, "federal courts analyzing federal law claims against Maryland sheriffs follow *Rucker* in holding that the sheriff acts as a state official when exercising law enforcement functions." *Id.* (citing *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 650–51 (D. Md. 2004)). The Court continued, "[o]nly in unusual circumstances, such as when a sheriff acts as a local policy maker, can a county be subject to liability for his actions under *Monell v. Department of Social Services*, 436 U.S. 658 (1978)." *Id.*

*Santos v. Frederick County Board of Commissioners*, the first case upon which Plaintiffs rely, constituted one such unusual case.  *Santos v. Frederick Cnty. Bd. of Comm'rs*, 346 F. Supp. 3d 785, 798-99 (D. Md. 2018).  There, in a case that pre-dated *Ledergerber*, this Court considered whether a sheriff's immigration enforcement-related actions exposed a county board to liability under § 1983.  *Id.* To reach its decision in favor of municipal liability, the Court considered four factors critical to an Eleventh Amendment immunity analysis:

> While many factors must be considered in determining whether an entity is the alter ego of the state, it is generally held that the most important consideration is [1] whether the state treasury will be responsible for paying any judgment that might be awarded ... Other important inquiries underlying our consideration of eleventh amendment immunity include, but are not necessarily limited to, [2] whether the entity exercises a significant degree of autonomy from the state, [3] whether it is

---

[3] The Court observes that Harford County has moved to dismiss the entirety of the Complaint against it, and Plaintiffs have asserted both federal claims and State Constitutional claims under Count I.  (ECF No. 1 at 34) (asserting claims under Articles 19 and 24 of the Maryland Declaration of Rights).  The plausibility of those claims also depend on whether the conduct of the Sheriffs are attributable to the County.

involved with local versus statewide concerns, and [4] how it is treated as a matter of state law.

*Id.* at 798 (citing *Ram Ditta v. Maryland Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457-58 (4th Cir. 1987)).  Looking at each factor, the Court determined first that the county treasury was responsible for any judgment that might be awarded and that the fourth factor was neutral under those facts.  *Id.* at 798-99.  Turning to the issue of autonomy, the Court reasoned that "[w]hile the law enforcement function of the Sheriff's office is typically overseen by the state, when deciding whether to participate in federal immigration enforcement, [the sheriff] operated independently from the state." *Id.* at 799. Further, "[i]n the narrow field of federal immigration enforcement…[the municipality] acts autonomously from the State." *Id.*  Thus, the second factor weighed against Eleventh Amendment immunity.  *Id.*  Turning to the policymaking factor, the Court noted that "only [the sheriff] has authority to set local immigration enforcement policy" that "had no statewide effect."  Thus, *Stantos* turned on "a unique agreement whereby the federal government directly delegates its own plenary power over immigration by deputizing local political subdivisions to perform certain functions of an immigration officer." *Id.* at 794.  Finding that on those facts, the sheriffs and deputies were not subject to Eleventh Amendment immunity because they acted as unique immigration policy makers, the Court ultimately imposed liability upon the County.  *See id.* at 800.

Post-*Santos*, this Court has repeatedly distinguished the circumstances there as an outlier scenario involving an agreement between County and State conferring policymaking power in the Sheriff. *See Ledergerber*, 2020 WL 7029868, *4; *J.A.*, 2024 WL 3638023, at *4; *Brooks*, 2023 WL 6244612, at *8.  As such, the Court finds, as in others like *J.A.* and *S.D.*, that Plaintiffs' reliance on *Santos* is misplaced, as no unique agreement or other circumstance has been pled here.  *See J.A.*, 2024 WL 3638023, at *4 ("The circumstances of *Santos* are not present here. Plaintiff does

not allege that [the defendant] possessed, or exercised, authority to make or enforce a County policy."); *see also S.D.*, 2026 WL 376741, at \*4 (distinguishing the *Santos* immunity test from a vicarious liability issue by way of a *Harter v. Vernon* analysis). As such, the Court is unpersuaded to deviate from the well-founded precedent that rejects Plaintiffs' *Santos* arguments when weighing outlier scenario presented there with the allegations pled in the Complaint here. Moreover, the Court finds that the Complaint fails to allege the unique circumstances necessary to impose liability on the County, as the majority of Plaintiff's *Santos* arguments rely on factual assertions unpled in the Complaint. Indeed, a plaintiff cannot amend a complaint to add facts through motions briefing. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (indicating a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), *aff'd,* 141 F.3d 1162 (4th Cir. 1998). Thus, the Court is not prepared to blur the boundaries this Court has previous placed between circumstances involving the unique agreement between Sheriff and County present in *Santos* with the allegations underlying the claims here in a blanket ruling to the contrary at this juncture.

The Court will next consider Plaintiffs' reliance on *Dotson*, which addresses at the very least, a sheriff's relationship with a county jail in one particular instance. *Dotson v. Chester*, 937 F.2d 920, 926 (4th Cir. 1991). There, the Fourth Circuit held that in the context of a § 1983 claim, Maryland state law did not "compel the conclusion that the Sheriff, when managing the County Jail, is a state policymaker." *Id.* Thus, the *Dotson* court's liability determination depended on whether the sheriff there "had final policymaking authority for the County over the County Jail." *Id.* at 924. Carefully considering Dorchester County law, the court ruled in favor of liability. *See id.* Later, *Ledergerber* clarified that absent the *Dotson* final policymaking authority exception, federal courts analyzing federal law claims against Maryland sheriffs follow the Maryland state

rule that a sheriff acts as a state official when performing law enforcement duties. *Ledergerber*, 2020 WL 7029868, *4. In *Ledergerber*'s wake, discussion of this issue has been somewhat watered down, as Courts have repeatedly recognized that *Dotson* applied to a narrow scenario with a specific statutory scheme at issue. *E.g.*, *J.A.*, 2024 WL 3638023, at *5.

In *Dotson*, that narrow scenario arose when previous inmates at the Dorchester County Detention Center brought suit after having reached a § 1983 settlement and the plaintiffs sought to execute judgment against the sheriff. *Dotson*, 937 F.2d at 922. In reaching a conclusion that the sheriff acted as a final policymaker there, the Fourth Circuit observed "the [Dorchester] county commissioners …empowered a nonpartisan board…to act as jail supervisors" rather than opting to be a Charter County. *Id.* at 929. That board had "supervision and control of the jail and adjoining grounds" and was charged with "pass[ing] and enforce[ing] all necessary rules for the protection and the health, cleanliness, and comfort of inmates, and for the regulations of all matters connected with the general management of the jail." *Id.* Then, in 1961, Dorchester County "transferr[ed] certain responsibilities to the Sheriff," thereby making the Sheriff "empowered to make…by-laws, rules and regulations, as he may think necessary and proper, for the clothing, regulation, management, control and conduct" of prisoners engaged in work or manual labor. *Id.* at 930. Ultimately, the court recognized that "[r]egardless of the County's reasons for transferring the final policymaking authority from county citizens to the County Sheriff…the historical changes in the Code demonstrate that the County Jail has been and remains a *county* facility." *Id.*

To that end, the Complaint fails to plead any facts showing Sheriff Gahler or Warden Galbraith acted as a final policymaker within the meaning of *Dotson*. The Complaint pleads facts showing that, at most, Sheriff Gahler and Warden Galbraith have spoken on the matter of suicides at HCDC in the press. (ECF No. 1 at 2, 15, 29, 31, 33). Similarly, the Complaint pleads facts

showing that Defendant Galbraith had contact with Plaintiff's Morris's family and a role in preventing the family's timely learning of Mr. Morris's hospitalization and suicide attempt. *See generally id.* What is absent from the Complaint are the allegations showing that either of them had any policymaking influence. Disregarding the Plaintiffs' legal conclusions to that effect, the Complaint pleads no facts showing that the State intended to confer policymaking authority upon the County by way of the Sheriff or Warden or that the Sheriff or Warden possessed such authority.

While the Court certainly agrees with Plaintiffs that such a possibility is not foreclosed, the Complaint fails to establish a plausible factual basis upon which the Court could find that *Dotson* has been satisfied. In view of the facts that were dispositive in *Dotson*, including reference to the statutory schemes applicable to the County and Sheriff, the Complaint presently fails to state a claim entitling Plaintiffs to a plausible inference that Sheriff Gahler or Warden Galbraith acted as county officials. For example, the Complaint fails to plead any facts concerning the Harford County Code, whether it is a Charter county under *Dotson*, or similar facts showing Sheriff Gahler or Warden Galbraith acted in any capacity other than as State actors tasked with carrying out enforcement duties at a County facility. Based on the foregoing analysis, there can be no Count I liability against the County as a matter of law under the present Complaint. *Dotson*, 937 F.2d at 924.

Therefore, the Motion to Dismiss (ECF No. 36) is GRANTED with respect to Count I without prejudice and with leave to amend.

2.    *Plaintiffs' Remaining ADA and Rehabilitation Act Claims Fail under Paulone v. City of Frederick*

Against the backdrop set forth above, Courts have recognized that "*Dotson* does not…swallow up the rule by making a county sheriff a county official for all decisions he makes while managing a county jail." *Kronk v. Carroll Cnty., Md.*, Civil Case No. L–11–0277, 2012 WL

245059, at \*7 (D. Md. Jan. 25, 2012).  In *Paulone v. City of Frederick*, the Court contemplated *Dotson's* applicability to ADA and Rehabilitation Act cases.  *Paulone*, 787 F.Supp.2d. at 377. There, Judge Hollander recognized that unlike in a § 1983 case, there can exist *respondeat superior* liability for violations of the ADA and Rehabilitation Act.  *Id.* (citing *Love–Lane v. Martin,* 355 F.3d 766, 782 (4th Cir.), *cert. denied,* 543 U.S. 813 (2004)).  Thus, because the record supported a finding that the *Paulone* sheriffs were state employees, the Court granted summary judgment in favor of a county defendant and noted that the State was the proper defendant under the facts discovery revealed there.  *Id.*

Based on the reasoning set forth above and the differences *Paulone* recognized between a § 1983 case and ADA and Rehabilitation Act cases, the Court must also dismiss Counts II and III against the County. Plaintiffs are not presently entitled to an inference that Sheriff Gahler or Warden Galbraith acted as Harford County defendants.[4]  Absent allegations concerning what control or authority Sheriff Gahler and Warden Galbraith possessed beyond press appearances, the Court is unable to plausibly infer they were County employees such that the ADA and Rehabilitation Act claims are cognizable.  The Court must also dismiss Counts II and III.

Therefore, Harford County's Motion to Dismiss (ECF No. 36) is GRANTED without prejudice and with leave to amend.

## C.    Defendant State of Maryland's Motion to Dismiss

Defendant State of Maryland moves to dismiss on three grounds: (1) that the State is not a 42 U.S.C. § 1983 "person'" (2) that the State has immunity from State Constitutional tort claims;

---

[4] The factual deficiencies described herein further preclude any finding that the Complaint has met the test set forth in *Butler v. Drive Automotive Industries of America, Inc*., 793 F.3d 404, 414 (2015). Again, the dispositive fatality here is the issue of control and authority. The Court therefore cannot making a finding that Plaintiffs are entitled to an inference of joint liability.

and (3) that the ADA and Rehabilitation counts must be dismissed because Mr. Morris's accommodations were not clearly communicated or obvious. (ECF No. 42). The briefing opens with some dispute as to what claims have been asserted against the State, and the Court admits some difficulty in understanding what exactly has been pled against the State in view of the Complaint compared to the briefs. Plaintiffs argue they "appropriately sued Maryland by asserting claims against its Sheriff and Warden in their official and individual capacities" with respect to Count I, which asserts multiple federal and state causes of action. (ECF No. 55 at 33). In response to Defendant's first argument, that it is not a § 1983 person, Plaintiffs state that they seek to clarify the State's "confus[ion] and/or misrepresent[ation] [of] the claims Plaintiffs make against the State and its officials in Count I—whether intentionally or not":

> Count I includes Plaintiffs' claims for unconstitutional and deliberate indifference to fundamental rights of detainees to be safe while incarcerated at the Harford jail. These claims—all rooted in the same unconstitutional pattern and practice— include Plaintiffs' claims against state and county officials and entities for declaratory relief, prospective injunctive relief, and damages pursued under the federal and state constitutions, with claims properly lying against each named Defendant in some capacity.

*Id.* Notwithstanding their arguments to the contrary against Harford County, they now argue, "[a]s to the 'State Defendants' this includes the 'State of Maryland' entity, and the individual officials Plaintiffs allege (and the State has not denied) are jointly employed by the state and county, Sheriff Gahler and Warden Galbraith." *Id.* at 33-34. In several instances, it appears as though Plaintiffs seek to impose liability under Count I against the State of Maryland for violations of the Federal and State Constitution because they have stated claims against Sheriff Gahler and Warden Galbraith, based on their extensive *Ex parte Young* briefing. However, the briefing also at certain points suggests otherwise as Plaintiffs explicitly summarize their stated claims under Count I as follows:

Sheriff Gahler and Warden Galbraith in their official capacities: Fourteenth Amendment and §1983 claims for declaratory and prospective injunctive relief;

Sheriff Gahler and Warden Galbraith in their individual capacities: Fourteenth Amendment and §1983 claims for nominal damages (to the NAACP) and compensatory damages (to Mr. Morris);

State of Maryland entity: Count I claims for declaratory and prospective equitable relief under the Maryland constitution, in addition to claims in Counts II and III.

(ECF No. 55 at 34). Where the statement here seems to concede that Plaintiffs do not wish to bring any portion of their § 1983 claims against the State, the Court is mindful that the briefing discusses at length the viability of the § 1983 claims by way of theories of joint and/or derivative liability.

In view of the assertions under Count I, the Court does not find the State's misunderstanding of Count I as inappropriate as Plaintiffs represent throughout their opposition, as the paragraphs clarifying their several claims under Count I and how each one applies to each Defendant does not appear in the Complaint. In fact, Count I generally refers to "Defendants" and rarely, if ever, refers to some separation between claim and Defendant. (ECF No. 1 at 34-36). Similarly, Plaintiffs do plead is that "Maryland is named as a Defendant (a) on Plaintiffs' claims seeking declaratory and prospective injunctive relief as a covered entity under the ADA and the Rehabilitation Act, and (b) as a responsible entity for state constitutional violations and torts committed by its agents under the Maryland Tort Claims Act." *Id.* at 8. In light of the many theories of liability and/or other responsibility that the parties dispute in their briefs, and in recognition of the great importance of the allegations in the Complaint, the Court will consider each challenged or otherwise conceivably asserted claim against the State, starting with the question of whether the State is a proper defendant in this suit.

1.  *The State is an Improper Defendant Under Count I insofar as Plaintiffs Assert a Federal Constitutional Violation, If Any*

    i.  The State is Not a 42 U.S.C. § 1983 "Person"

For the sake of completeness, the Court begins with whether the State is a § 1983 "Person." *Will v. Michigan Department of State Police* makes clear that "a State is not a person within the meaning of § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989). Where Plaintiffs clearly dispute whether *Will* applies here based on the injunction theory, they do not seem to dispute the general notion that the State is not a § 1983 "person." (ECF No. 55 at 34 ) ("As *Will* explained, **state officials** acting in their **official capacity** are amenable to suit for injunctive relief under Section 1983…") (emphasis added)). The Court there noted that "[o]bviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Id.* at 71. Therefore, the Court concluded "it is no different from a suit against the State itself" and thus, "state officials acting in their official capacity [are not] 'persons' under § 1983." *Id.* Plaintiffs are correct that suits for injunctive relief present a different outcome with respect to *state officials*. *Id.* at n.10. (emphasis added). "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* However, such a rule has no bearing on the plausibility of a claim against the State itself. Therefore, to any extent that there exists a remaining question as to whether Plaintiffs have brought a § 1983 claim against the State, it is DISMISSED without prejudice and with leave to amend. *See id.*

ii.    *Ex Parte Young Does Not Create a Cause of Action Against the State Itself*

Plaintiffs repeatedly argue that the claims against a Sheriff or Warden for injunctive relief are actionable under § 1983. (ECF No. 55). Defendants do not address this argument. (ECF No. 65). The Court can find no authority in support of the proposition that *Ex parte Young* relief somehow confers liability upon the State such that the State itself is a proper defendant. Nor are

there any arguments to that effect.  Rather, it appears that Plaintiff's argument in favor of the State remaining as a Defendant is predicated on the notion that state officers acting in their official capacity are the State itself.  *See generally* (ECF No. 55).  The very essence of *Ex parte Young* relief depends "on a determination that an unconstitutional state enactment is void and that any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such action is a nullity."  *Papasan v. Allain*, 478 U.S. 265, 276 (1986).  Therefore, *Ex parte Young* applies when plaintiffs, as here, seek to enjoin the enforcement of an allegedly unconstitutional state law. *E.g.*, *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154, 168 (D. Md. 2022) (considering whether a claim against an official could survive summary judgment when the plaintiff failed to allege the official engaged in an ongoing unconstitutional conduct for the Court to enjoin). As such, Courts consider *Ex parte Young* suits against those official capacity state defendants who are "responsible for the challenged action" or who "'by virtue of his office, has some connection' with the unconstitutional act or conduct complained of." *Luckey v. Harris*, 860 F.2d 1012, 1015-16 (11th Cir. 1988) (quoting *Ex parte Young*, 209 U.S. at 157).

The Court observes much of Plaintiffs' *Ex parte Young* analysis strives to defeat Defendant's Eleventh Amendment arguments.  (ECF No. 55 at 35).  Those arguments, however, do not shed light on whether the State itself is a proper defendant in the first place.  Where *Ex parte Young* could ultimately apply to the claims against Sheriff Gahler and Warden Galbraith, they miss the concern with the Plaintiffs' suit against the State.  The Court cannot find any authority cited in Plaintiffs' brief in support of the proposition that the State itself is a proper *Ex parte Young* defendant when they have also brought claims against the officials they argue are responsible for the continuing constitutional violations. Nor can the Court find any proposition to that effect in the

Plaintiffs' opposition in the first place. To the contrary, this Court has acknowledged that *Ex parte Young* suits are those "against state officials (not the State as the State)." *MCI Telecomm. Co. v. Frisby*, 998 F.Supp. 625, 629 (D. Md. 1998) (citing *Green v. Mansour,* 474 U.S. 64, 68 (1985)). Therefore, finding no authority supporting the notion that the State becomes a proper *Ex parte Young* defendant in pleaded cases seeking to enjoin state officials, any § 1983 claim for injunctive relief against the State as a defendant itself must be dismissed.

### iii.    *Ex parte Young* Claims Do Not Create Joint Liability Such that the State Becomes a Defendant

The opposition refers in several instances to the State's status as a Defendant insofar as Sheriff Gahler and Warden Galbraith are its agents. *See, e.g.*, (ECF No. 55 at 33) ("Maryland is mistaken that it can duck liability for its employees' ongoing, unconstitutional pattern and practice of wanton abuse and deliberate indifference that continues to claim innocent lives."); *see also id.* ("As noted above, the Defendants' division of legal representation for the state entity and the officials it jointly employs with the County has led it to confuse and/or misrepresent the claims Plaintiffs make against the State and its officials in Count I—whether intentionally or not."). However, an *Ex parte Young* claim, by its very nature, does not confer liability for damages against the State. It is by virtue of permitting the enjoinment action against a state department or official that an *Ex parte Young* suit creates an exception to a bar against the State. *Eller*, 580 F. Supp. 3d at 168. ("As an exception to the bar on § 1983 suits against a state, suits for "prospective injunctive relief against state officials acting in violation of federal law" are permitted pursuant to *Ex parte Young*…"); *Pevia v. Hogan*, 443 F. Supp. 3d 612, 632 (D. Md. 2020) ("[T]o avoid an Eleventh Amendment bar to suit…the [*Ex parte Young*] complaint must be lodged against a state official…").. Indeed, a proper *Ex parte Young* suit permits a federal court to "issue prospective, injunctive relief against a state official to prevent ongoing violations of federal law, such as when

the state officer is enforcing, or threatening to enforce, an allegedly unconstitutional state law." *Id.* Therefore, Plaintiffs' references to theories of joint "liability;" i.e., damages, are similarly unavailing in this context. To any extent that such a purported "joint liability[5]" theory is asserted, it must be dismissed.

Ultimately, any federal claim against the State under Count I must be dismissed. Therefore, to any extent one is asserted under the Complaint, the Motion to Dismiss (ECF No. 42) is GRANTED without prejudice and with leave to amend.

>        2.        *A Claim for Injunctive Relief has Not Been Properly Brought Against the State under the Maryland State Constitution and the State has Immunity from Such Claims*

Moving to what the Court believes to be Plaintiffs' intended theory against the State, Defendant also seeks dismissal of the Count I based on sovereign immunity. As discussed above, the *Ex parte Young* claim does not resolve all of the State's immunity arguments. Plaintiffs emphasized in their Opposition brief that they seek only injunctive relief against the State based on the alleged ongoing violations of Articles 19 and 24 of the Maryland Declaration of Rights, and as state claims, immunity is not available. To that end, Plaintiffs argue "[a] state or state agency is not immune from suits alleging constitutional torts when the remedy that is necessary to vindicate or protect a state constitutional right is equitable in nature, requiring a declaration of

---

[5] This reasoning is not to be confused with that underlying claims brought against local municipalities pursuant to a theory of vicarious liability. Indeed, Maryland does allow state constitutional claims against local government entities when brought under a theory of *respondeat superior*. See *Albero v. Worchester Cnty. Bd. of Commr's*, Civil No.: JKB-24-1100, 2025 WL 462588, at *10 (D. Md. Feb. 11, 2025) (dismissing only two state constitutional claims against a defendant county when the plaintiff sought to hold the county liable for their conduct under a theory of *respondeat superior*); *Palmer v. Maryland*, Civil No. 1:22-0899-CDA, 2024 WL 4349730, at *6 (D. Md. Sept. 30, 2024) ("Maryland law has a broader reach and 'imposes respondeat superior liability on municipalities for [ ] State constitutional violations of its employees,' while *Monell* claims do not.") (citations omitted) *McMahon v. Cnty. Comm'rs of Kent Cnty.*, No. CIV. JFM-13-490, 2013 WL 2285378, at *5 (D. Md. May 21, 2013) ("Maryland, unlike the United States, [ ] imposes respondeat superior liability on local government entities for civil damages resulting from State [c]onstitutional violations committed by their agents and employees within the scope of the employment."). Given that the present claims have been brought against the state, and in light of the arguments presented to the Court, a theory of vicarious liability does not apply.

rights or injunctive relief against a state agency, or seeking a form of remedy other than damages." (ECF No. 55 at 36) (citing *Jackson v. Pena*, 28 F. Supp. 3d 423, 435 (D. Md. 2014)).  Yet, *Jackson* simply noted that state *agencies* are not necessarily immune from suits for injunctive relief when contemplating whether a state department could be liable for damages.  *Jackson*, 28 F. Supp. 3d at 435 n.8.  In other words, *Jackson* did not consider a purported *Ex parte Young* suit against a state itself and not by way of an official or agency.  *See id.*  In Defendant's reply, the State argues that the *Jackson* language originated from *Baltimore Police Department v. Cherkes*, in which a Maryland state court distinguished in dicta claims for declaratory and injunctive relief from claims for monetary damages.  *Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 310 (2001).  Based on the *Ex parte Young* analysis above, the issue remains that Plaintiffs must bring an action for injunctive relief against a state official or agency.

The parties also dispute whether the State may even argue it has immunity state constitutional tort claims. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  Therefore, "absent consent or a valid congressional abrogation of sovereign immunity,[6] the Eleventh Amendment bars a private individual from bringing suit against a state in federal court to recover damages, unless there is an exception to sovereign immunity." *Pevia*, 443 F. Supp. 3d at 630.  One such exception is under *Ex parte Young*, which the Court already concluded does not apply against the State as a Defendant here. *See Supra* Discussion III.C.1.ii.

As the Fourth Circuit stated in *Weller v. Department of Social Services for City of Baltimore*, "[t]he waiver of sovereign immunity in the Maryland Torts Claims Act clearly limits

---

[6] Here, there is no argument concerning abrogation.

the state's waiver of immunity to actions brought in the Maryland state courts." *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 397 (4th Cir. 1990); *see also Clark v. Md. Dep't of Pub. Safety and Corr. Servs.*, 247 F. Supp. 2d 773, 775 (D. Md. 2003) (recognizing that Maryland consented to suit in state court by way of the Maryland Tort Claims Act, but it has not consented to suit in federal court). Indeed, when the state raises the defense of Eleventh Amendment sovereign immunity, the Court "reviews that defense under Federal Rule of Civil Procedure 12(b)(1)." *Krell v. Queen Anne's Cnty.*, No. CV JKB-18-637, 2018 WL 6523883, at *3 (D. Md. Dec. 12, 2018); *see also Criscione v. U.S. Nuclear Regul. Comm'n*, 493 F. Supp. 3d 423, 430 (D. Md. 2020).

Against the jurisdictional backdrop above, and taking the arguments presented, Plaintiffs are incorrect that the State has waived sovereign immunity. To the extent that Plaintiffs refer multiple times to some form of "liability" they wish to impose upon the State for the state constitutional violations, seeing no clear waiver of immunity, the State has immunity from direct suits brought in federal court. Therefore, the Motion to Dismiss (ECF No. 42) must be GRANTED without prejudice and with leave to amend under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

3.   *Plaintiffs have Stated a Failure to Accommodate Theory but Failed to Plead Theories of Disparate Treatment or Disparate Impact under Counts II and III*

The State next moves to dismiss the ADA and Rehabilitation Act counts because Mr. Morris's need for any accommodation was neither clearly communicated nor obvious or apparent. (ECF No. 42-1 at 9). To begin, "[t]he Fourth Circuit treats claims under the Rehabilitation Act and the ADA as the same" and combines the claims "'for analytical purposes because the analysis is substantially the same.'" *Koon v. North Carolina*, 50 F.4th 398, 403 n.2 (4th Cir. 2022) (quoting *Seremeth v. Bd. of County Comm'rs*, 673 F.3d 333, 336 n.1 (4th Cir. 2012)). To plead such claims,

a plaintiff must allege that he (1) "has a disability;" (2) "is otherwise qualified to receive the benefits of a public service, program, or activity;" and (3) "was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (quoting 42 U.S.C. § 12132). Plaintiffs may argue discrimination occurred through "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Paulone*, 787 F. Supp. 2d at 371 (D. Md. 2011) (quoting *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008)). The Complaint references only a theory based on the failure to accommodate Mr. Morris. *See generally* (ECF No. 1). Yet, Plaintiffs explain in their Opposition brief that their claim is predicated on theories of disparate impact and disparate treatment as well as failure to accommodate Mr. Morris.[7] (ECF No. 55 at 19). Whether Mr. Morris is an individual with a disability who was qualified to receive

---

[7] Defendant also briefly argues that any allegations based on the other suicides are time-barred. (ECF Nos. 42-1 at 13; 65 at 8). As the State puts it, excluding those allegations concerning suicide attempts from over three years ago, "[t]hat leaves Nathaniel Powell, Jr., seven anonymous individuals, and Brittani Ugrotzi." (ECF No. 42-1 at 13). Of those, they argue, Mr. Powell's father is the only NAACP member, and therefore the NAACP cannot rely on allegations about individuals who are neither members nor affiliated with the organization. *Id.* Yet, the State admits that Mr. Morris's claim has been timely brought and that he is an NAACP member. *Kravitz v. U.S. Dep't of Com.*, 366 F. Supp. 3d 681, 736 (D. Md. 2019), *remanded sub nom.*, *La Union Del Pueblo Entero v. Ross*, 771 F. App'x. 323 (4th Cir. 2019) ("An organizational plaintiff's standing can be based on . . . representational standing, where the injury is to the organization's members."). To that extent, the Court does not find the brief mention of a standing issue meritorious. Turning to the brief mention that the claims are time-barred, because Title II of the ADA does not contain a statute of limitations, federal courts "borrow the state statute of limitations that applies to the most analogous state-law claim." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). Moreover, considering the substantial similarity between the language in the ADA and Rehabilitation act, the Fourth Circuit has applied the same analysis to determine the statute of limitations in Rehabilitation act claims. *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 687 (4th Cir. 2017). Ultimately, the Fourth Circuit decided that a three-year statute of limitations is applicable to such cases brought in Maryland. *Id.* at 558 (collecting cases). In *Brinkley-Obu v. Hughes Training, Inc.*, a case both parties point to, the Fourth Circuit also noted that the statute of limitations does "not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action" such that a plaintiff could not introduce evidence at trial considering her co-workers. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 346 (4th cir. 1994). Therefore, the Fourth Circuit recognized that in the context of Equal Pay Act claims, the statute of limitations "does not dictate which co-workers the plaintiff may submit as comparators." Initially, the Court notes that many procedural aspects of *Brinkley-Obu* are distinguishable here. However, for the purposes of resolving the arguments raised, the Court trusts Plaintiffs' representation that the facts pled concerning those other detainees serves as circumstantial evidence of the Defendant's knowledge and continuing practices at HCDC and are not an attempt to bring additional untimely claims. Therefore, the Court is not persuaded to dismiss the timely filed ADA and Rehabilitation claims brought on Mr. Morris's and the NAACP's behalf on this basis.

the benefits of a public service, program, or activity are not in dispute.  Thus, it is only the theories of liability that are at issue.

       i.       Plaintiffs Plead a Cognizable Failure to Accommodate Claim at this Early Stage

Plaintiffs have adequately pleaded a failure to accommodate theory based on HCDC's decisions related to Mr. Morris.  A public entity must make reasonable modifications when that entity has knowledge of a person's limitations. *Seremeth*, 673 F.3d at 336 ("Discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.") (other citations omitted).  Thus, "a plaintiff must establish knowledge on that entity's part, meaning the entity is aware of a known physical or mental limitation, evincing a clear need for accommodation." *Thompson v. Badgujar*, No. 20-CV-1272-PWG, 2021 WL 3472130, at *9 (D. Md. Aug. 6, 2021).  Knowledge can be shown through evidence of a specific request or that the need for an accommodation is obvious or apparent. *Jarboe v. Md. Dep't of Public Safety & Corr. Servs.*, No. ELH-12-572, 2013 WL 1010357, at *19 (D. Md. March 13, 2013) (citing *Kiman v. New Hampshire Dep't of Corrs.*, 451 F.3d 274, 283 (1st Cir. 2006)); *Smith v. City of Greensboro*, No. 1:19CV386, 2020 WL 1452114, at *13 (M.D.N.C. Mar. 25, 2020) ("Knowledge of the need for an accommodation can...arise because the need is obvious.") (other citation omitted)); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007) ("[B]efore a public entity can be required under the ADA to provide an auxiliary aid...the entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability.").  Evidence of an obvious disability includes observation of apparent mental health limitations. *E.g.*, *Estate of LeRoux v. Montgomery Cnty., Md.*, Civil Action No. 8:22-856-AAQ, 2025 WL 2997563, at *10 (D. Md. Oct. 24, 2025) (finding a genuine issue of material fact as to

knowledge when there was evidence that a McDonalds employee told officers by way of a 911 call that the decedent was "acting crazy").

It is true that the Complaint does not plead that Mr. Morris asked for an accommodation. (ECF No. 42-1 at 11). However, as this Court has recognized before, doing so is not necessary to state such claims. *See id.* The Complaint pleads many details concerning the statements Mr. Morris made during his screening interview, including those that Plaintiffs allege correspond to known suicide risk factors, some of which are even contained in the HCDC manual. (ECF No. 1, *passim*). Plaintiffs even plead that HCDC staff stated in retrospect that Mr. Morris should have been placed on suicide watch based on their knowledge of his behavior and his comments to them. (ECF No. 1 at 24). Although the Court would agree that more may be necessary to prevail at a later stage, Plaintiffs are not required to submit a fully developed case to survive the pleading standard. *See Jarboe*, 2013 WL 1010357, at \*19 (denying a motion to dismiss or in the alternative for summary judgment when "a full factual record, developed through discovery," would benefit the Court in resolving accommodation questions). Similarly, survival at the pleading stage does not preclude the possibility that Defendant finds discovery to strengthen the arguments presented here. Based on all the details Plaintiffs plead concerning the apparent risks of suicide that Mr. Morris presented, the Court is satisfied that Plaintiffs have stated a claim at this early stage based on a theory of failure to accommodate. Discovery will shed light on what exactly the State knew or should have known based on Mr. Morris's statements and other actions. *Id.*

Therefore, the Motion to Dismiss (ECF No. 42) is DENIED with respect to a failure to accommodate theory.

<div style="margin-left:2em">

ii. <u>Plaintiffs Failed to Properly Plead theories of Disparate Treatment or Disparate Impact Such that Defendants Would Have Notice of the Claims Against Them</u>

</div>

In its Reply brief, the State argues that Plaintiffs attempt to shoehorn in claims not previously alleged in response to Plaintiffs' arguments that they have stated claims for ADA and Rehabilitation Act liability through theories of disparate treatment and disparate impact. Perhaps partially attributable to the same cause of the parties' briefing disputes, the Court is again presented with a scenario in which the Complaint states a cause of action based on a specific theory, Defendants have moved to dismiss based on the theory articulated, and Plaintiffs have responded in opposition, clarifying for the first time what they actually intended to plead and arguing Defendant waived any argument to the contrary. For example, under Counts II and II, at no point do Plaintiffs reference disparate treatment or disparate impact. (ECF No. 1 at 36-38). To the contrary, they repeatedly plead that the State failed to accommodate Mr. Morris. As the State observes, the word "disparate" does not appear once in the Complaint. Of course, the Court recognizes that conclusory allegations are insufficient to survive a motion to dismiss. At the same time, Rule 8 "is intended to: 'give fair notice of the claim being asserted' to the adverse party; 'sharpen the issues to be litigated;' and 'confine discovery and the presentation of evidence at trial within reasonable bounds.'" *Plumhoff v. Centr. Morg. Co.*, 286 F.Supp.3d 699, 701 (D.Md. 2017) (quoting *T.M. v. D.C.*, 961 F.Supp.2d 169, 173-74 (D.D.C. 2013)); *see also Wynn–Bey v. Talley*, No. RWT-12-3121, 2012 WL 5986967, at *2 (D. Md. Nov. 28, 2012) (noting that a district court "is not obliged to ferret through a [c]omplaint, searching for viable claims").

As such, the Court cannot conceive how the Complaint could put the State on notice of disparate treatment or impact claims against it under a Complaint that fails to refer to those theories. The Court further observes the extensive briefing Plaintiffs submitted in support of their theories—briefing the Court finds compelling in substance but does not address the fundamental issue that Plaintiffs have failed to articulate such theories in the Complaint itself. This conclusion

certainly does not foreclose the possibility that such claims can be stated in such a manner that can survive a motion to dismiss; however, at this juncture, and in view of the unpled theories upon which Plaintiffs predicate nearly their entire opposition, the Court must dismiss the theories of disparate impact and disparate treatment.

Therefore, the Motion to Dismiss (ECF No. 42) is GRANTED in part and DENIED in part with respect to Counts II and III.

### D.    Defendants Gahler and Galbraith's Motion to Dismiss

The Court now turns to the individual Defendants' Motion to Dismiss (ECF No. 42), which raises several arguments in support of dismissal of Count I against them.

> 1.    *The Court Declines to Find that Defendants Gahler and Galbraith have Waived their Supervisory Liability Arguments, and the Complaint Fails to State Such a Claim*

Defendants first move to dismiss on the basis that individuals are not susceptible to a pattern or practice claim.    (ECF No. 43). Plaintiffs' familiar pattern re-emerges: Plaintiffs responded describing a detailed theory of § 1983 supervisory liability and argue that Defendants have waived any challenge to such a theory.    In response, Defendants Gahler and Galbraith, like the State, argue that the Complaint fails to put Defendants on notice of a supervisory liability claim as a matter of law.    (ECF No. 67 at 10-11).    As such, they argue Plaintiffs seek to amend their complaint by way of their brief, which is not permitted.

As Plaintiffs acknowledge in their Response in Opposition, a *Monell* theory of liability "is distinct" from a supervisory liability theory.    Defendants are correct that other courts in this Circuit have criticized complaints for lumping together supervisory liability and municipal liability claims because "[d]ifferent legal principals govern these two species of liability." *Dowdy v. Pamunkey Reg. Jail Auth.*, No. 3:14-CV-003-JAG, 2014 WL 2002227, at *8 (E.D.Va. May 15, 2014) ("Count

III lumps together claims of supervisory liability and municipal liability. Different legal principals govern these two species of liability."). "A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013). Thus, to state a claim for a theory of supervisory liability, Plaintiffs must plausibly allege

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Burley v. Balt. City Police Dept.*, 422 F.Supp.3d 986, 1032 (D. Md. 2019) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted)).  In view of the allegations necessary to survive a motion to dismiss, the Court agrees that such a claim differs substantially from those necessary for a *Monell* claim based on an unconstitutional pattern or practice.

Defendants continue, "[t]he substance of the claim also sounds in *Monell* municipal liability." (ECF no. 67 at 13).  For example, Plaintiffs plead that "[b]y their policies and practices, acts, omissions and deliberate indifference to harms described above, Defendants have engaged in an unlawful pattern and practice[.]" (ECF No. 1 at 34).  They similarly allege that "Defendants have established and entrenched an unlawful policy, practice and custom of failing to adequately protect or provide adequate care for individuals at risk of suicide[.]" *Id.* In their Opposition brief, Plaintiffs argue they rely on their allegations introducing the parties, which vaguely and in conclusory fashion state that Defendants Gahler and Galbraith have final decision-making authority over HCDC, allegations the Court finds insufficient to support a plausible inference of what that authority is, beyond making press appearances.  *See supra* Section III.A.1. The Court agrees with Defendants that simply stating Sheriff Gahler and Warden Galbraith have supervisory authority neither provides sufficient notice nor supports a plausible inference that Defendants

Gahler and Galbraith have been sued under a theory of supervisory liability. Without making clear that Plaintiffs intend to assert a claim predicated on supervisory liability, Plaintiffs have neither provided proper notice under Rule 8, nor stated a plausible claim.

The Court also agrees with Defendant Gahler's and Galbraith's larger challenge to Count I, that is Count I's failure to plead clear, separate claims in violation of Rule 8 and Local Rule 103.1(c) (D. Md. 2025). "Each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). Under this Court's Local Rules, "[a]ny pleading that states a claim for relief shall set forth each count separately and provide a clear statement of the supporting facts for each count." Loc. R. 103.1(c). Plaintiffs caption Count I as "Fourteenth Amendment to the U.S. Constitution, 42 U.S.C § 1983, and Articles 19 and 24 of the Maryland Declaration of Rights Deliberate Indifference to Unconstitutional Conditions of Confinement Exacerbating Risk of Suicide and Serious Medical Needs." (ECF No. 1 at 34). Fundamentally, the conjoined nature of this caption (and its ensuing allegations) is misleading in view of Plaintiffs' stated theories in their Opposition briefs, and Plaintiffs have not articulated clear, direct, or separate causes of action as they so urge. There may well be a sufficient basis upon which the Court could plausibly infer such a theory as a matter of law. But Plaintiffs must articulate it in their Complaint.

Finding no allegations sufficient to plead or put Defendants on notice of a supervisory liability theory, the Court must also dismiss the claim based on supervisory liability. Defendant Gahler's and Galbraith's Motion to Dismiss (ECF No. 42) is GRANTED without prejudice and with leave to amend on this basis.[8]

### 2. Plaintiffs Fail to State an Official Capacity Claim

---

[8] This conclusion disposes of any claim against Defendant Gahler and Galbraith for individual liability. Similarly, the Court will not reach a substantive analysis on this issue but recognizes that Defendants Gahler and Galbraith have not waived their qualified immunity argument. Should Plaintiffs file an amended Complaint, they may re-raise their qualified immunity argument if they so choose.

Defendants next move to dismiss the official capacity claim against them for several reasons. (ECF No. 67 at 23-26).

### i.    The Complaint Fails to State an *Ex parte Young* Relief Action

Defendants first challenge whether Plaintiffs have met the narrow *Ex parte Young* exception to immunity in official capacity claims. (ECF No. 67 at 23). As an initial matter, and recognizing the Court's *Ex parte Young* analysis with respect to the State, the Court agrees that if any claim can be maintained for injunctive relief, it is a claim against Defendants Gahler and Galbraith based on the facts pled here. Applying the principles stated there, the Court turns to the substance of the claim. Plaintiffs argue that "in their roles as Sheriff and Warden, Gahler and Galbraith have created and enforced policies and condoned practices at HCDC that 'are the proximate cause of Plaintiffs' ongoing deprivation of rights secured by the Fourteenth Amendment to the U.S. Constitution.'" (ECF No. 54 at 30). Based on the Court's analysis under Harford County's Motion, there is no factual basis under the Complaint to support an inference that Defendants Gahler and Galbraith have created any policy. Moreover, to the extent they have "enforced policies," the gravamen of Plaintiffs' *Ex parte Young* claim is that Defendants have improperly enforced HCDC suicide-risk policies by way of poor discretionary decision-making, and do not appear to challenge the whether the state policies themselves are constitutional. Similarly, Plaintiffs do not allege that any law is unconstitutional. Thus, they fail to state a claim for *Ex parte Young* relief on that basis. *Eller*, 580 F.Supp.3d at 168 ("These claims for injunctive relief do not fall within the *Ex parte Young* exception because Eller does not seek to enjoin the enforcement of an allegedly unconstitutional state law.").

Moreover, a plaintiff must "challenge a ministerial, not discretionary, act" under *Ex parte Young*. *See Brooks*, 2023 WL 6244612, at *12; *see also Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002) ("There is no doubt that the court cannot control the exercise of the discretion of an

officer. It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action."). As this Court has recognized in the policing context, "acts—training, permitting, or allowing officers to use excessive force and to arrest without a warrant or legal justification—plainly involve the exercise of discretion," therefore precluding *Ex parte Young* relief. *Brooks*, 2023 WL 6244612, at \*12. Here, the discretionary enforcement nature of Plaintiffs' allegations also precludes *Ex parte Young* relief. *Id.* Therefore, the Court must dismiss Plaintiffs' *Ex parte Young* claim, and Defendant's Motion to Dismiss (ECF No. 43) is GRANTED without prejudice and leave to amend on this basis.

### ii. Defendants Gahler and Galbraith are Not Jointly Liable with the State and County

Defendants Gahler and Galbraith next raise a sovereign immunity defense, to which Plaintiffs have argued that they are "both county and state officials." (ECF No. 54 at 33). This argument is somewhat confusing, as Plaintiffs insist they seek only to enjoin Sheriff Gahler and Warden Galbraith. Moreover, based on the Court's analysis of this issue with respect to Harford County's Motion to Dismiss, Plaintiffs' argument that they acted as County officials is unavailing. The Court applies the same reasoning here. Although the Court grants leave to amend under *Dotson*, the Court is skeptical of the possibility that Defendants could act as state and county officials as a matter of law. That notwithstanding, the Court reiterates its Harford County reasoning and finds that the official capacity claims are presently barred to any extent they seek damages. *Open Just. Baltimore v. Baltimore City L. Dep't*, No. CV ELH-22-1901, 2023 WL 5153654, at \*15 (D. Md. Aug. 10, 2023) ("[W]hen a plaintiff sues an individual in his or her official capacity, and also sues a municipality or agency for the same conduct, the claims against the individual are duplicative."); *Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity,

when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (other citation omitted); *Cnty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd.*, 150 F.App'x 389, 401 (6th Cir. 2005) ("[A] plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to the official's job, *i.e.*, his official capacity.").

>           3.      *Defendants are Not Entitled to Immunity from Plaintiffs' Fourteenth Amendment and Article 24 Claims at this Time*

Also under Count I, Plaintiff includes claims alleging violations of Articles 19 and 24 of the Maryland Declaration of Rights. (ECF No. 1). Defendants move to dismiss those claims as well. Article 24 is construed *in pari materia* with the Fourteenth Amendment. *See Dipino v. Davis*, 354 Md. 18, 43, 729 A.2d 354 (1999); *Telep v. Stickney*, No. 1:23-CV-02379-JMC, 2024 WL 2114761, at *9 (D. Md. May 10, 2024) (collecting cases). To that end, Defendants argue here that the claim must fail because state officials have immunity from such claims under the Maryland Tort Claims Act, Md. Code Ann, State Gov't, § 12-101 *et seq.*, (the "MTCA"). But, the MTCA provides immunity only when constitutional violations are committed within the scope of official duties and "without malice or gross negligence." *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011); *see also Lee v. Cline*, 384 Md. 245, 261 (2004). "The actual malice needed to defeat official immunity requires an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Leese v. Balt. Cnty.*, 64 Md. App. 442, 480, (1985), *cert. denied*, 305 Md. 106, (1985), *overruled on other grounds by Woodruff v. Trepel*, 125 Md. App. 381 (1999). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another and also implies a thoughtless disregard of the consequences without the

exertion of any effort to avoid them." *Newell v. Runnels*, 407 Md. 578, 638 (2009) (quoting *Barbe v. Pope*, 402 Md. 157, 187 (2007)).

"Bare legal conclusions" regarding malice "are not binding on the court." *Hovatter v. Widdowson*, No. CIV.CCB-03-2904, 2004 WL 2075467, at *7 (D. Md. Sept. 15, 2004). "Even at the motion to dismiss stage, the plaintiff must allege with some clarity and precision those facts which make the act malicious." *Francis v. Maryland*, Civil Action No. ELH-21-1365, 2024 WL 1156407, at *22 (D. Md. Mar. 18, 2024) (quotations omitted). "And, [p]laintiffs face a high standard when pleading malice because conclusory allegations are insufficient." *Id.*; *see also Elliott v. Kupferman*, 58 Md. App. 510, 528 (1984) ("To overcome a motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious."). "Issues involving gross negligence are often more troublesome than those involving malice because a fine line exists between allegations of negligence and gross negligence." *Francis*, 2024 WL 1156407, at *23 (quotations omitted).

Here, there are no allegations that can plausibly allege actual malice. The Court finds otherwise with respect to gross negligence. *See Kleger v. Dorchester Cnty, Md.*, Civil Case No: 1:24-CV-00095-JMC, 2024 WL 3555044, at *12 (D. Md. Jul. 23, 2024) (finding certain allegations of a corrections facility's staff sufficient to survive the pleading standard based on gross negligence rather than malice). Based on the allegations showing a five-year history of detainees showing certain suicide warning signs that, depending on their treatment, often resulted in successful suicide attempts, and the Defendant's alleged failures to make any screening or monitoring changes, the Court is not persuaded to find Article 24 immunity at this time. At this early stage, the Court is not prepared to reach a premature conclusion with respect to Defendants Gahler's and

Galbraith's states of mind.  The Court is satisfied that at the very least, the allegations are sufficient to state a plausible Fourteenth Amendment and Article 24 claim at this time.

Therefore, Defendant's Motion to Dismiss (ECF No. 43) is DENIED with respect to the Fourteenth Amendment and Article 24 claim.

### 4. Article 19 Does Not Apply

Article 19 of the Maryland Declaration of Rights provides "[t]hat every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land."  MD. CONST. ART. XIX.   Article 19 is "intended to ensure 'access to courts.'" *Doe v. Cmty. Coll. of Baltimore Cnty.*, 595 F. Supp. 3d 392, 407 (D. Md. 2022) "[T]he constitutional provision generally prohibits unreasonable restrictions upon traditional remedies or access to the courts ..." *Jackson v. Dackman Co.*, 422 Md. 357, 378 (2011) (quoting *Johnson v. Maryland State Police,* 331 Md. 285, 297 (1993)).  As such, Court has dismissed Article 19 claims when a plaintiff has clearly availed himself to the judicial process. *E.g. Jones v. Queen Anne's Cnty., Md.*, Civil No.: 1:24-cv-01333-JRR, 2025 WL 744054, at *8 (D. Md. Mar. 7, 2025) (finding that "Article 19 has no place here" when the "[p]laintiff has ably availed himself of the judicial process by filing his [c]omplaint"); s*ee also Palmer v. Maryland*, No. CV 1:22-0899-CDA, 2024 WL 4349730, at *4 (D. Md. Sept. 30, 2024) (finding inappropriate an Article 19 claim when the plaintiff brought claims under other laws that permitted redress for his claims).  Here, as the Court has denied the motion to dismiss with respect to Article 24 and the Fourteenth Amendment, there can be no void in liabilities.  Therefore, the Article 19 claim must be dismissed as inapplicable.

## IV.    CONCLUSION

For the reasons set forth above, it is this 15th day of June 2026 hereby ORDERED:

(1) Plaintiffs' Motion to Strike (ECF No. 36), construed as a properly filed objection, is GRANTED;

(2) Defendant Harford County's Motion to Dismiss (ECF No. 36) is GRANTED without prejudice and with leave to amend;

(3) Defendant State of Maryland's Motion to Dismiss (ECF No. 42) is GRANTED with respect to Count I without prejudice and with leave to amend;

(4) Defendant State of Maryland's Motion to Dismiss (ECF No. 42) is GRANTED in part and DENIED in part with respect to Counts II and III such that Plaintiffs have only stated a failure to accommodate theory and are granted leave to amend;

(5) Defendants Gahler and Galbraith's Motion to Dismiss (ECF No. 43) is GRANTED with respect to a supervisory liability and individual liability claim without prejudice and with leave to amend;

(6) Defendants Gahler and Galbraith's Motion to Dismiss (ECF No. 43) is GRANTED with respect to an official capacity claim without prejudice and with leave to amend;

(7) Defendants Gahler and Galbraith's Motion to Dismiss (ECF No. 43) is DENIED with respect to a Plaintiffs' Article 24 and Fourteenth Amendment claims;

(8) Defendants Gahler and Galbraith's Motion to Dismiss (ECF No. 43) is GRANTED with respect to Plaintiffs' Article 19 claim; and

(9) Plaintiffs shall file an Amended Complaint, if they so choose, within twenty-one days of the entry of this Opinion and Order.

Date: <u>June 15, 2026</u>                    <u>       /s/                    </u>
                                              J. Mark Coulson
                                              United States Magistrate Judge