**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **HARFORD COUNTY BRANCH of the NAACP**<br>Post Office Box 525<br>Aberdeen, Maryland 21001<br><br>and<br><br>**CHARLES MORRIS**<br>c/o Mayer Brown LLP<br>1999 K Street N.W.<br>Washington, DC 20037<br><br>Plaintiffs,<br>v.<br><br>**SHERIFF JEFFREY GAHLER,** individually, and in his official capacity as Harford County Sheriff,<br>45 South Main Street<br>Bel Air, Maryland 21014<br><br>**WARDEN DANIEL J. GALBRAITH,** individually, and in his official capacity as Warden of the Harford County Detention Center,<br>1030 Rock Spring Road<br>Bel Air, Maryland 21014<br><br>**HARFORD COUNTY, MD,**<br>Serve On:<br>County Executive Robert G. Cassilly<br>220 South Main Street<br>Bel Air, Maryland 21014<br><br>**STATE OF MARYLAND,**<br>Serve On:<br>Attorney General Anthony Brown<br>200 St. Paul Place<br>Baltimore, Maryland 21202<br><br>Defendants. | **Civil Action No.: 26-00239-JMC**<br><br>**JURY TRIAL DEMANDED**<br><br>**AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

JURISDICTION AND VENUE .......... 3

PARTIES .......... 4

FACTUAL ALLEGATIONS .......... 7

I. DEFENDANTS COLLECTIVELY OVERSEE AND ARE ENGAGED IN AN UNLAWFUL AND CONTINUING PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SAFETY OF PEOPLE IN THEIR CARE .......... 7

A. Defendants Gahler And Galbraith are the Primary Officials Responsible for All Aspects Of Policies, Operation, Administration and Leadership of HCDC, Including but not Limited to Directing Jail Operations; Setting, Writing and Enforcing Policies; Securing and Overseeing Contracts for Services; and Oversight, Supervision and Training of Employees.......... 7

B. HCDC Officials and Staff Knowingly Disregard Established Legal and Medical Standards, Exacerbating Risks of Suicide-Related Harm to Vulnerable Detainees. .......... 9

C. Defendants Disregard or Exacerbate Obvious Red Flags for Suicide, Respond to Suicidal Ideation With Punishment, and Violate Their Own Written Policies, Resulting in a Devastating Pattern of Needless Human Suffering. .......... 13

D. Plaintiff Charles Morris Nearly Died as a Result of Defendants' Willful and Deliberate Indifference.......... 23

E. HCDC Officials at the Highest Levels Ignore and Minimize the Overwhelming Evidence of Risk, Forcing NAACP Officials and Members to Intervene. .......... 29

II. ACTIONS AND INACTIONS OF DEFENDANTS GAHLER AND GALBRAITH AS SUPERVISORS AND FINAL POLICYMAKERS CONTROLLING HCDC HAVE CAUSED THE EXTENSIVE PATTERN OF AVOIDABLE DEATHS, INJURIES AND HUMAN SUFFERING AT THE JAIL .......... 33

A. Under Defendants Gahler and Galbraith, HCDC has Developed Widespread Practices or De Facto Customs So Permanent and Well Settled That They Function With the Force of Law. .......... 33

B. Defendants Gahler and Galbraith's Failures of Leadership Demonstrate Deliberate Indifference, Gross Negligence and Tacit Authorization of Legal Violations at the Jail. .......... 35

**TABLE OF CONTENTS**
(continued)

**Page**


C. There is an Affirmative Causal Link Between Gahler and Galbraith's Acts and Omissions and the Legal Violations at the HCDC....... 38

D. The Sheriff and Warden Failed Adequately to Train and Supervise Employees, Despite the Obvious Risk of Suicides and Evidence That HCDC Practices Result in a High Rate of Suicides Following Similar Patterns....... 40

III. HARFORD COUNTY CONTROLS, FUNDS, AND BEARS LIABILITY FOR FEDERAL LEGAL VIOLATIONS COMMITTED AT HCDC....... 41

A. Pursuant to Harford County's Charter and Relevant Law, the HCDC, the Sheriff, Warden and All Jail Staff Are Treated as and Act as County Agents and Employees....... 41

B. The Operation of the HCDC Primarily Implicates Local Concerns. ....... 48

IV. THE STATE AND COUNTY ARE JOINTLY AND SEVERALLY LIABLE FOR HCDC VIOLATIONS OF THE ADA AND REHABILITATION ACT....... 48

A. The HCDC Fails to Accommodate Persons, Such as Mr. Morris, Subject to Disabilities. ....... 48

B. The HCDC's Policies and Practices Disparately Impact Persons With Disabilities, Like Mr. Morris. ....... 50

C. The HCDC Subjects Persons With Disabilities, Such as Mr. Morris, to Disparate Treatment....... 51

CAUSES OF ACTION....... 52

PRAYER FOR RELIEF ....... 60

JURY DEMAND....... 60

# INTRODUCTION

1. Perhaps the most fundamental constitutional duty of jail officials is to keep people in their care alive and safe. Tragically, this is something the Harford County Detention Center ("HCDC") has failed to do.

2. HCDC's suicide rate is more than five times the national average, compounded by dozens of recent, preventable suicide attempts. Plaintiffs, their members, and their loved ones have suffered terribly and needlessly.

3. Defendants improperly dismiss this deadly crisis as beyond their control. According to HCDC's warden, Daniel J. Galbraith, "[i]f somebody wants to kill themselves, they're determined and they've made their mind up, they're going to find a way."[1]

4. The medical community categorically rejects Defendants' fatalism. As HCDC's Suicide Prevention and Crisis Manual recognizes, it is a "myth" that "[s]omeone who is really intent on committing suicide cannot be stopped," and a "fact" that "most suicidal people want to be rescued." People contemplating suicide "are ambivalent about living, not intent on dying."[2]

5. Plaintiff Charles Morris illustrates that point. Today, he is glad to be alive. But for a few dark hours in August 2024, Defendants' misconduct robbed him of all hope. HCDC staff ignored red flags noted in their own policies, including Mr. Morris's tearful confession that he did not see a reason for living, his diagnoses of major depression and bipolar disorder, and his seizure disorder. They locked Mr. Morris in a solitary cell for 23 hours a day, with a bunk bed practically purpose-built for suicide attempts. Predictably, like others before him, he hung himself. When jail

---

[1] Ben Conarck, *Why is the suicide rate so high at this Maryland jail?*, THE BALT. BANNER, Feb. 15, 2024, https://www.thebanner.com/community/criminal-justice/after-a-spate-of-suicides-in-the-harford-county-jail-was-anybody-watching-NKNDBS4B3ZCWJDKSQ6JOMVBD5A/.

[2] HARFORD COUNTY DETENTION CENTER SUICIDE PREVENTION AND CRISIS INTERVENTION MANUAL, 4.

staff found him, he had apparently been hanging for several minutes and was not breathing. He was rushed to Bayview Hospital, where he spent a week fighting for his life.

6. Defendants then sought to cover up the incident to prevent Mr. Morris's family from discovering HCDC's malfeasance, insisting *no family be notified* and that Mr. Morris remain alone with no loved ones to support him or assist in any medical decision-making as he lay near death, hospitalized in a coma. Defendants directed hospital staff that Mr. Morris's family would *only* be notified of his devastating injuries if he became brain dead.

7. Mr. Morris was the latest victim of HCDC's lethal pattern and practice of deliberate indifference, including Defendants' malign insistence on maintaining practices that exacerbate—and even encourage—the risk of suicide attempts, their refusal to take rudimentary precautions, and their *de facto* punishment of survivors. Among other things:

a. HCDC routinely fails to adequately assess suicide risk, regularly failing to identify people in significant jeopardy, *e.g.*, people experiencing severe withdrawal or with well-documented serious mental health needs.

b. Although isolation severely aggravates the risk of distress and self-harm, the jail defaults to locking people in 23-hour-per-day solitary confinement upon arrival.

c. Flouting basic standards of care, HCDC keeps people in solitary even after determining they are suicidal, without anything remotely adequate by way of monitoring, therapeutic care, or re-evaluation.

d. Although hanging is the leading cause of death in jails, including HCDC, the jail uses cells with superfluous bunks that serve as makeshift gallows.

e. HCDC's responses to suicide attempts often are unnecessarily punitive and involve excessive force, effectively punishing people for attempting suicide.

f. To cover up their wrongdoing, Defendants falsify records, withhold information from families, and preclude families from accessing and supporting their loved ones, while publicly proclaiming the jail blameless.

*g.* HCDC's "suicide watch" is so deficient that people have been able to rehearse their suicide attempts or even die while supposedly under observation.

8. In short, HCDC receives vulnerable people like Mr. Morris, subjects them to the deficient screening, isolation, and lack of monitoring described above, and as a result, they deteriorate until they seek to end their lives—a pattern of anguish, self-harm, and death far surpassing that of any other Maryland jail.

9. For years, Plaintiff Harford County Branch of the National Association for the Advancement of Colored People ("NAACP") has sought lifesaving reforms at HCDC for itself and its members, without success. Despite deadly tragedies, extensive media coverage, and many warnings urging action, Defendants maintain callous and deliberate indifference to the risks and needs of those in their care, often putting more effort into defending their track record than addressing the harms.

10. Plaintiffs NAACP and Charles Morris now bring this action to finally end this pattern of cruelty, needless suffering, and death.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as a civil action under the United States Constitution and federal laws, including 42 U.S.C. § 1983.

12. The Court has supplemental jurisdiction over Plaintiffs' state constitutional claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy and arise from the same nucleus of operative facts as Plaintiffs' claims under federal law.

13. Venue is properly in this District pursuant to 28 U.S.C. § 1391 because all the events giving rise to Plaintiffs' claims occurred in Harford County, Maryland.

14. Plaintiff Charles Morris provided timely notice of the facts and circumstances giving rise to his state law damages claims against the State of Maryland ("Maryland") and Harford County. He has received final denials from Maryland's Treasurer and Harford County—each

claiming the other was responsible for the violations alleged—satisfying his obligations under Md. Code, State Gov't § 12-106 and Md. Code, Cts. & Jud. Proc. § 5-304.

## PARTIES

15. **Plaintiff NAACP** is a non-profit, non-partisan membership organization with more than 300,000 members and two million supporters. The NAACP is the nation's largest and oldest grassroots-based civil rights organization. The Harford County branch was started in 1920. It has 330 members who vote to elect the branch's president and other members of its executive committee. It sues on behalf of itself and its members, for declaratory and prospective equitable relief, as well as nominal damages in the amount of $1.

16. This lawsuit is central to the NAACP's mission, which includes "securing the political, educational, social and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons." Addressing incarceration-related health disparities, especially for Black and other communities of color, is a hallmark of the NAACP locally and nationally: in 2022, the NAACP adopted a resolution, "In-Custody Deaths – Incarcerated Residents Constitutional Protections Recovery," addressing process failures and neglect in prisons and jails that "result in the unnecessary and preventable loss of life" disproportionately harming persons of color.

17. The State of Maryland has the highest "racial incarceration gap" in the country, meaning that Black people in the state are imprisoned at higher rates relative to their share of the population than any other state. This statewide trend is no less true in Harford County—Black people are far more likely to be arrested and detained than White people locally. For lower-level crimes in the County, Black people were 8.2 times more likely to be arrested than White people.

18. The Harford branch of the NAACP has organizational standing to sue for equitable relief on behalf of itself and its members because, after decades advocating for police

accountability, it has shifted significant time and resources to ameliorate the harms that HCDC's deadly pattern of misconduct poses to NAACP members. This includes time and resources for direct engagement, including: (a) participating on the Harford County Sheriff's Office ("HCSO" or "Sheriff's Department") Community Board, (b) attending Harford County Police Accountability Board meetings, and (c) participating on the Maryland Commission on Hate Crime Response and Prevention. The NAACP also (a) investigates complaints about HCDC and monitors Defendants' management of the jail; (b) meets with Defendants to resolve complaints, tour the jail, and urge remedial measures to avert further harm; (c) conducts community education and engagement to enhance awareness and build support for jail reform; and (d) pursues and publicizes public information about Defendants' practices, including a May 2024 request for the racial demographics of stops and searches by the Sheriff's Department and a November 2024 request for records detailing suicides and suicide attempts at HCDC.

19. The Harford NAACP further enjoys associational standing to pursue relief on behalf of its members—a majority of whom are Black—because its members include, among others, persons directly injured by the misconduct set forth herein, such as: (a) Charles Morris, who attempted suicide at the jail and suffered punishing "treatment" before and after his suicide attempt; (b) his sister, DeVora Jones; (c) Nathaniel Powell Sr., who is independently engaged in legal action related to the suicide of his son, Nathaniel Powell Jr. at HCDC; and (d) others who themselves have been or are incarcerated at HCDC, or have loved ones incarcerated there, some experiencing addiction disorders and/or mental health disabilities. In bringing suit on behalf of these members, the NAACP seeks to ensure the future health and safety of those who are incarcerated at HCDC and the ability of their loved ones to obtain reliable, timely information in the event of emergencies.

20. **Plaintiff Charles Morris** is and was, at the time of the events complained of herein, a resident of Harford County, Maryland. On August 2, 2024, Defendants' abuse drove Mr. Morris to attempt suicide at HCDC, where he nearly died. Mr. Morris is a member of the NAACP and a qualified individual with a disability as defined by the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of 1973 (the "Rehabilitation Act"). Specifically, Mr. Morris is diagnosed with both major depressive and bipolar disorders, as well as a serious seizure disorder, and was also temporarily disabled by suicidality at HCDC. Defendants' acts and omissions harmed Mr. Morris as set forth below.

21. **Defendant Jeffrey Gahler** is the Sheriff for Harford County and, in this capacity, is an agent of Harford County and the state of Maryland. As sued in his official and individual capacities, Defendant Gahler is a "person" acting at all times under color of state law under the federal and state constitutions and 42 U.S.C. § 1983. At all relevant times, Sheriff Gahler was an official with final decision-making authority and control over HCDC and the Sheriff's Department. He is directly responsible for (a) HCDC and Sheriff's Department policies; (b) the care and custody of all persons detained at HCDC; and (c) the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents. Plaintiff Charles Morris also sues Defendant Gahler in his individual capacity for monetary damages.

22. **Defendant Daniel Galbraith** is the Warden of HCDC and, as such, is an agent of Harford County and the state of Maryland. As sued in his official and individual capacities, Warden Galbraith is a "person" acting at all times under color of state law within the meaning of the federal and state constitutions and 42 U.S.C. § 1983. At all relevant times, Warden Galbraith was an official with final decision-making authority and control over HCDC, including its policies and personnel. He is directly responsible for the appointment, retention, supervision, training, and

conduct of his officers, deputies, employees, and agents, and for the care and custody of persons confined at HCDC. Plaintiff Charles Morris also sues Defendant Galbraith in his individual capacity for monetary damages.

23. **Defendant Harford County**, the County where the events alleged herein occurred, is a charter county and a "person" within the meaning of the federal constitution and 42 U.S.C. § 1983. Harford County is a "public entity" under Title II of the ADA, 42 U.S.C. § 12131, and qualifies as a program or activity receiving federal financial assistance, covered by the Rehabilitation Act. Harford County is named as a Defendant, as a responsible entity for HCDC, on Plaintiffs' claims seeking declaratory, prospective injunctive relief and damages pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, and as a covered entity under the ADA and the Rehabilitation Act.

24. **Defendant State of Maryland** is a "public entity" under Title II of the ADA, 42 U.S.C. § 12131, and further, is a program or activity receiving federal financial assistance, covered by the Rehabilitation Act. The State is jointly liable with Harford County for conduct of HCSO employees in violation of Title II of the ADA, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a). Maryland is named as a Defendant, as a responsible entity for HCDC, on Plaintiffs' claims seeking declaratory, prospective injunctive relief, and damages, as a covered entity under the ADA and the Rehabilitation Act.

## FACTUAL ALLEGATIONS

### I. DEFENDANTS COLLECTIVELY OVERSEE AND ARE ENGAGED IN AN UNLAWFUL AND CONTINUING PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SAFETY OF PEOPLE IN THEIR CARE

#### A. Defendants Gahler And Galbraith are the Primary Officials Responsible for All Aspects Of Policies, Operation, Administration and Leadership of HCDC, Including but not Limited to Directing Jail Operations; Setting, Writing and

**Enforcing Policies; Securing and Overseeing Contracts for Services; and Oversight, Supervision and Training of Employees.**

25. In litigation Sheriff Gahler has brought in this District, he states:

> Maryland Sheriffs are the chief law enforcement officers of their counties. In many jurisdictions, including [Harford County] the Sheriff operates and manages the local correctional facility. In those jurisdictions, sheriffs typically supervise hundreds of deputies and correctional officers and manage facilities with hundreds of inmates. … [They] supervise deputies who interact with the public every day, and *bear ultimate responsibility* for public safety within their jurisdictions.

Compl. ¶ 5, *Gahler v. Moore*, No. 26-cv-2057 (D. Md.), ECF 1 (emphasis added).

26. The Sheriff, who is locally elected, appoints the Warden, who in turn exercises all of the supervisory authorities described above, subject to the Sheriff's ultimate control. Defendant Gahler, as Sheriff, and Defendant Galbraith, as Warden, are each officials with final decision- and policy-making authority and control over HCDC, its policies, and its personnel.

27. HCDC is entirely staffed, organized, and overseen by the HCSO, and its correctional staff members are correctional deputy sheriffs who ultimately serve at the pleasure and direction of Sheriff Gahler and Warden Galbraith.

28. As the primary officials responsible for HCDC, Defendants Gahler and Galbraith are directly responsible for every aspect of jail policy, administration, and operations, including written policies and customs, patterns and practices. They determine which policies and practices the jail adopts, supervise their implementation, and bear responsibility for ensuring compliance with all policies, correctional standards and laws.

29. Nearly all of HCDC's operative policies, including its intake, interview, housing assignment, and special confinement policies, were developed, enacted, reviewed, approved and signed personally by Sheriff Gahler and implemented under the command of Warden Galbraith.

30. Sheriff Gahler and Warden Galbraith are also responsible for ensuring the provision of all services at the jail, including medical and mental health services, and for determining which

contractors the jail will utilize for such services, staffing levels, which services are or not included in any contract, and how such contractors are monitored, supervised and held accountable in the case of violations.

31. Warden Galbraith has direct daily oversight and management of all HCDC operations, including extensive personal involvement in decisions about housing, classification, isolation, medical and mental health for individual detainees pursuant to HCDC written policies and customs.

32. Warden Galbraith has oversight authority not only over HCDC correctional staff but also over contractual medical and mental health personnel. Under HCDC's Health Care Services policy, HCDC's mental health provider is required to consult with and obtain approval from Warden Galbraith before assigning housing, disciplinary management, or transfers involving detainees diagnosed with psychiatric illness.

33. Upon information and belief, in addition to Warden Galbraith, Sheriff Gahler is personally notified in the event of serious injury or death of any detainee at HCDC and confers with the Warden to formulate and carry out HCDC's response.

### B. HCDC Officials and Staff Knowingly Disregard Established Legal and Medical Standards, Exacerbating Risks of Suicide-Related Harm to Vulnerable Detainees.

34. Jails assume responsibility for the safety of the people in their care, including protecting against the leading cause of death in jails: suicide. As HCDC's own written policies expressly acknowledge: "*Correctional officers **are responsible for preventing suicides**–both legally and morally... Management and prevention of suicide is a critical area in which the correctional officer can be the difference between life and death.*"[3] Yet, as detailed below, under

[3] *Id.*

the leadership and control of Sheriff Gahler and Warden Galbraith, Defendants, their agents and employees engage in a longstanding, reckless and deliberate pattern and practice of misconduct, violating their own policies and well-established correctional standards.

35. ***Deficient screening, monitoring and treatment.*** Because most jail suicides and attempts occur among pretrial detainees within the first seven days of booking, effective initial screening and monitoring are vital. People often arrive at jail in crisis, facing acute stressors, and are disproportionately likely to be intoxicated or in withdrawal, to have histories of mental illness or psychiatric disabilities, or to have missed prescribed medications—all of which increase suicide risk. Rather than engaging in meaningful evaluation, monitoring, or treatment, HCDC officials regularly wait until a person is actively self-harming or announces a specific intent to commit self-harm, before flagging the person as at-risk, flouting basic standards of care and their own policies.

36. ***Excessive reliance on isolation and solitary confinement.*** Solitary confinement significantly increases feelings of hopelessness and suicide risk—two out of every three people who committed suicide in jail were held in isolation.[4] HCDC's Suicide Prevention and Crisis Intervention Manual dictates that a correctional officer who believes an inmate is suicidal should ***not*** "[p]lace the inmate in isolation, even if the inmate is unruly or abusive, unless a special watch of continuous staff observation is initiated."[5] Yet Defendants routinely violate this command: HCDC (a) routinely places newly detained individuals in 23-hour-per-day solitary confinement precisely when they are at greatest suicide risk, and (b) utilizes housing policies that invite solitary confinement as a knee-jerk response to nearly every medical, mental health, or other special need—exacerbating those very risks. Defendants know this.

---

[4] Lindsay M. Hayes & Barbara Kajdan, *And Darkness Closes In . . . A National Study of Jail Suicides* iii (Nat'l Ctr. on Insts. & Alternatives 1981), https://www.ojp.gov/pdffiles1/Digitization/81482NCJRS.pdf.

[5] *Supra* note 2, at 12-13.

37. ***Deficient monitoring even for those identified as needing suicide or medical observation.*** Even when the jail *does* place people on suicide watch or other medical observation, monitoring and mental health care have often been so inadequate that people end up hurting themselves or dying anyway. Remote surveillance alone is not enough to monitor suicidal people; cameras may supplement, but do not substitute for, human contact and direct observation. As explained by Lindsay Hayes, a leading expert on preventing jail suicides, use of "[video surveillance] as an alternative to staff observation is not supported by national correctional standards … Despite its intended use, [video surveillance] does not prevent a suicide, it only records a suicide attempt in progress."[6] Yet HCDC routinely relies on cameras instead of human monitoring, leaving individuals on "suicide watch" essentially unmonitored—resulting in failures, including an individual rehearsing his suicide, captured *on video* rather than prevented.

38. ***Protrusions easily used for hanging.*** Hanging is the top risk for jail suicide (93% of such deaths), and is especially grave because serious brain damage and death can occur within minutes of oxygen deprivation. Experts and common sense counsel that cells should be free of unnecessary protrusions that can be used for hanging, especially for people at risk of suicide. Yet HCDC routinely houses at-risk individuals in cells with unnecessary bunks even after repeated incidents of bunks being used in suicides and suicide attempts.

---

[6] Lindsay Hayes, *Report On Suicide Prevention Practices Within The Sacramento County Jail System: Sacramento, California*, Nov. 22, 2016, https://www.disabilityrightsca.org/system/files/file-attachments/%5B001-4%5D_Exhibit_D-Hayes_Report_2018-07-31.pdf; *See also* https://www.apt.ch/sites/default/files/publications/factsheet-2_using-cctv-en_0.pdf ("CCTV recording of cells to purposely prevent suicide attempts should not replace staff physically checking the situation of the persons concerned on a regular basis.").



39. ***Degrading, isolative and punitive responses to suicidality.*** Rather than responding to the needs of those contemplating suicide, HCDC's version of "suicide watch" often involves solitary confinement in restrictive-housing or basement "medical" cells, removal of property and clothing, and camera surveillance—despite HCDC's own suicide manual stressing that at-risk people should *never* be isolated, left alone, or subjected to unnecessary force, restraints, or punishment for their symptoms. Yet HCDC routinely imposes these inhumane conditions, exacerbating risks of self-harm and causing egregious additional pain and suffering.

40. At HCDC, "suicide watch" conditions are so extreme and unmitigated by any therapeutic response that they are more punitive than *disciplinary* segregation: Defendants routinely strip people of their clothing—pinning them down and cutting clothing from their bodies or forcing them to undress in front of multiple officials; strip them of all personal possessions, leaving some with nothing but a mattress; deny them human contact, confining them in solitary monitored only by video and often precluding family contact; and, in some instances, handcuff or strap suicidal people into fully immobilizing restraint chairs. These responses sometimes violate HCDC's own written policies governing suicide watch, which require access to normal activities,

"clothing which is not degrading,"[7] and personal items absent a risk of imminent danger.

41. In sum, HCDC's suicide rate of more than five times its peers is no accident, given the cascading impact of its deficient practices. Defendants' reckless conduct and deliberate indifference create the perfect storm for self-harm: HCDC routinely isolates new admittees 23 hours a day in cells with the means to hang themselves, without adequate mental health screening, monitoring, or human contact, even after they have been identified as needing observation.

42. This reactive posture—intervening only after a hanging has occurred, without examining what went wrong and what could have been done differently—fails both the people in HCDC's care and its own staff.

### C. Defendants Disregard or Exacerbate Obvious Red Flags for Suicide, Respond to Suicidal Ideation With Punishment, and Violate Their Own Written Policies, Resulting in a Devastating Pattern of Needless Human Suffering.

43. Below, Plaintiffs trace chronologically the disturbing record of pain and suffering wrought by Defendants' pattern of unlawful actions and omissions, beginning in 2019, as the NAACP began amplifying its previous calls for accountability and reform. The examples below largely recite facts from HCDC's own incident reports, obtained by the NAACP. Sadly, these are merely illustrative; there are many others.

44. **On April 10, 2019**, Mr. Marlyn Barnes, a 30-year-old father of five, died after using a sheet from his bunk to hang himself within a day of arriving at HCDC. According to news reports in the *Afro*, HCDC investigators acknowledged that he had disclosed wanting to take his own life.[8] He was reportedly extremely distressed. HCDC's failure to inform Mr. Barnes's family of the details of his death, and the months-long delay before they learned that the Medical

---

[7] HARFORD COUNTY SHERIFF'S OFFICE DETENTION CENTER POLICY: SPECIAL CONFINEMENT, 9 (2024).

[8] Special to the AFRO, *Suspicious Death Raises Questions*, AFRO, Aug. 30, 2019, https://afro.com/suspicious-death-raises-questions/.

Examiner had classified it as a suicide, left the family suspecting foul play and searching for the truth—as his mother told reporters at the time. His death was the subject of protests led by activists in the Black community outside the jail.

45. **Less than a month later, on May 1, 2019**, Thomas "Tommy" Pardew took his life by hanging. Mr. Pardew had been at the jail less than a week. According to news reports, footage captured Mr. Pardew practicing how he would hang himself—without interruption by HCDC staff—while supposedly on "suicide watch."[9] HCDC personnel, in violation of their own policy, failed to observe Mr. Pardew on an ongoing basis, or even at 15-minute increments. Indeed, after Mr. Pardew tied his jail-issued pants around his neck and then to the cell bars, more than 30 minutes passed before his limp body was discovered by correctional staff.

46. According to news reports, the nurse watching Mr. Pardew on video the day he died logged a ***false*** entry claiming he was lying on his bunk alive after he had already been hanging for more than 20 minutes.[10] Critically, jail officials' own reports acknowledged the falsification of crucial records and the potential cause: The nurse told detectives she was responsible for monitoring more than five detainees on her third day of employment. Despite this egregious failure that cost Mr. Pardew his life, jail officials took no relevant remedial actions. When asked by a reporter how the jail addressed the matter, Defendant Gahler said he couldn't remember the details, while disclaiming any responsibility.

47. Defendants' failures led to another tragic and preventable death the following year. On **April 24, 2020**, deputies found Randy Gisiner hanging from a sheet tied to the top bunk in his cell. Mr. Gisiner had previously been on suicide watch with drug detoxification protocols, but he

---

[9] *See* Ben Conarck, *System Failure: How a Man Killed Himself on Suicide Watch in the Harford County Jail*, THE BALT. BANNER, Feb. 15, 2024, https://tinyurl.com/ywvtzjmz.
[10] *Id.*

was moved off suicide watch into another cell, where he was improperly subjected to isolated confinement without adequate monitoring or medical treatment. Within 48 hours, he had deteriorated so severely that he hung himself using the plainly unnecessary upper bunk. His lifeless body was only discovered accidentally, because officers preparing to do shakedowns happened upon him. HCSO assigned its own detectives to investigate the incident, and no reforms came of it.

48. HCDC staff routinely miss signs that people are deteriorating to the point of no return. On **October 17, 2020**, HCDC staff discovered a detainee, "Mr. A," lying in a pool of his own blood and moaning after slashing himself with razors that HCDC staff had provided. According to incident reports, officers found the entire cell floor, walls, and toilet bathed in blood; the victim's shirt was drenched, and he had written a message in blood on the cell wall. Despite repeated radio calls for tourniquets and other assistance, medical staff were slow to respond, with one staffer stating that medical needed to "step up." Mr. A was taken to a hospital by ambulance.

49. "Mr. B's" case illustrates the same pattern. On **February 11, 2021**, Mr. B was ostensibly being monitored on continuous "suicide watch" via camera, subjected to withholding of all of his personal property, and expressing frustration with his continued isolation. Despite these escalating red flags, Mr. B was left in solitary confinement, where he was able to climb the bars of his cell, tie one end of his blanket to the bars, the other around his neck, and hang himself—all before a nurse purportedly providing continuous monitoring noticed, radioed correctional officers, and HCDC officers were able to untie the blanket. Only after being restrained in handcuffs and leg irons was he taken to the hospital.

50. Less than a week later, on **February 16, 2021**, "Mr. C" was ostensibly on suicide watch in HCDC's T dorm. Despite being on suicide watch, Mr. C managed to attach his shirt to

the top corner of his bunk and hang himself before an officer touring the dorm found him. HCDC's response was to put him on remote surveillance in the restrictive housing unit.

51. A few months later, on **July 3, 2021**, Jack Lazar was admitted to the jail on minor trespassing and "criminal mischief" charges. At intake, he disclosed his medical and psychological history. Because he was in drug withdrawal, staff placed him on medical observation requiring 15-minute checks, reduced to 30 minutes on July 6. After an incident requiring overnight hospitalization, Mr. Lazar confided to medical staff that he was struggling with his first-ever incarceration and was unable to reach his family. Despite displaying worsening mental health symptoms from his isolation, he was sent back to solitary without adequate monitoring. His cell had an unnecessary bunk bed. The next day, July 10, correctional staff found Mr. Lazar unconscious and hanging from the top bunk with a sheet tied around his neck. He never recovered, dying four days later.

52. HCDC staff sometimes respond to suicidal persons with handcuffing, shackling, threats of force, tasing, forcible undressing, or restraint chairs, under the guise of protecting detainees from themselves. On **June 20, 2022**, "Mr. D" was seen attempting to tie a blanket to the bars in apparent preparation for suicide, and mental health staff placed him on suicide watch. When jail staff sought to remove his property and he objected, multiple deputies—rather than de-escalating or involving mental health staff—violently entered the cell, struck Mr. D with a shield, pinned him to the wall, forcibly handcuffed him to the bed, cut off his pants with shears, and stripped all his clothing, then threatened to tase him if he moved after the cuffs were removed.

53. "Mr. E," a veteran, repeatedly asked to speak with mental health staff, and, according to an incident report, "had been drawing several graphic pictures of a figure being hung from a tree and posted them on his cell door." **On June 27, 2022**, staff found Mr. E hanging in his

cell; after they cut him down, he was choking and unable to control his extremities. Staff found a suicide note in his pocket and multiple notes and drawings relating to suicidal thoughts in his cell. Despite these many warning signs, mental health staff had failed to identify Mr. E as at risk, later falsely claiming to investigators that he "showed no signs" of suicide risk.

54. HCDC staff regularly assume that people who are disruptive, confrontational, or who simply make requests cannot ***also*** be suicidal or at ***increased*** risk, improperly dismissing real risks of harm as feigned attempts to secure some benefit—particularly for people with mental health disabilities. This violates established standards and HCDC's own suicide manual, which explains that such dismissals may be factually wrong and that, regardless of motivation, people engaging in self-harm remain at risk of injury or death, even accidentally.

55. For example, "Mr. F" displayed symptoms strongly suggestive of serious mental health issues, including throwing feces. On **September 28, 2022**, after other detainees called for help, HCDC staff found Mr. F with a string tied tightly around his neck. Although Mr. F "had started to turn purple," and despite medical staff determining that Mr. F needed urgent hospital treatment, jail officials expressed that he was not "actually" suicidal, but merely trying to manipulate them. Perhaps because of this disbelief, less than two weeks later, while on "suicide watch," Mr. F was able to make a second, very serious attempt on his own life.

56. On **January 21, 2023**, Defendants' failures led to another death, when Nathaniel Powell, Jr., son of NAACP member Nathaniel Powell, Sr., was found hanging in his cell. Jail officials missed obvious warnings that he was suffering from serious symptoms of depression and drug withdrawal, leaving him to deteriorate into such anguish that he took his life. At his initial screening on January 18, Mr. Powell worried about the serious losses he was facing and confessed that other family members had attempted suicide. The screening also indicated that Mr. Powell

was an extremely heavy user of opiates with prior withdrawal symptoms. He was flagged for an "urgent" mental health visit, but received only a flyby intake screening at his cell door with an HCDC staffer nearly 12 hours later. Even with just this cursory review, the staffer noted that Mr. Powell presented symptoms of depression and was "detoxing heavily and requested to remain in cell area for assessment." Although medical information available to her indicated Mr. Powell's child hospitalization for "emotional, mental health, and/or psychiatric problems," this staffer did not seek any clarification or elaboration.

57. HCDC thus improperly designated Mr. Powell as "low risk" for suicide, contrary to its own suicide prevention manual and its own staff's observation that Mr. Powell was in active withdrawal, showing symptoms of depression, and had a history of mental illness. Instead, HCDC designated Mr. Powell solely for periodic detox monitoring. Defendants then placed Mr. Powell in 23-hour-per-day solitary confinement in a cell with a dangerous bunk bed, without any treatment, and staff substituting cursory cell-side screenings for meaningful assessments of his plainly worsening condition. Indeed, staff acknowledged Mr. Powell's statement that he was in "excruciating pain." A *Baltimore Banner* article reports that detainees in nearby cells heard Mr. Powell "repeatedly calling for medical attention" and that "[w]hen those in cells near him feared he hanged himself, they called for deputies, who did not respond for at least [fifteen] minutes."[11] By the time Mr. Powell was found hanging in his cell, according to reports, he had no pulse. As explained below, in the aftermath of Mr. Powell's tragic death, jail officials rebuffed efforts by his family and the NAACP to address the serious harms at the jail, and attempted to cover up their misconduct, even withholding his suicide note.

58. According to a January 22, 2023 incident report, Warden Galbraith was observing

[11] *Supra* note 1.

from outside the cell when EMS called the time of death for Mr. Powell, and remained there for another 28 minutes. Yet, despite his personal involvement, Galbraith took no action subsequently to review root causes and assess changes to prevent future deaths like Mr. Powell's.

59. Less than two months later, the jail's perfect storm of deficient screening, deficient monitoring, and solitary confinement in cells with suicide-prone bunks led to another suicide attempt. **On March 9, 2023**, "Mr. G" was found unresponsive in his cell, hanging from a sheet attached to his bed frame. After the sheet was cut down, he was not breathing normally and was choking. He had been at the jail for five days on minor charges of an alleged violation of probation bench warrant for theft and acting as a contractor without a license. Although he had been referred to mental health staff and identified as having a special medical need, he did not receive the counseling or monitoring he needed. According to an incident report, he believed he would be bailed out shortly after arrival, given the minor nature of his charges. As the days passed and he remained in solitary confinement without any meaningful access to mental health treatment or basic social contact, he deteriorated and became so acutely distressed that he hung himself.

60. A **March 22, 2023** incident again illustrates HCDC's improper reliance on excessive force as a primary response to suicide attempts. "Mr. H" was already on suicide watch due to a prior suicide attempt, housed in HCDC's restrictive housing unit, and appeared to be experiencing symptoms of mental health disabilities. He again attempted to kill himself by hanging himself with a makeshift noose fashioned from his suicide smock and jumping from his bunk. Officers responded violently, with four officers pinning Mr. H onto his bunk, flipping him to his stomach, and handcuffing Mr. H—despite the fact that Mr. H offered what HCDC records describe as "passive" resistance to being handcuffed. Then, according to incident reports, corrections officers—not medical staff—ordered that Mr. H be placed in a restraint chair, to which he objected.

His objection was not unfounded. The United Nations Committee Against Torture has urged the United States to abolish such chairs, which have straps that prohibit any movement, as in the example shown below from the Pennsylvania prison system.[12]



Restraint chairs are an extreme response to be used only when there is no other way to protect someone under the supervision of medical staff, and for the shortest possible duration needed. Before confining him to a restraint chair, deputies had every opportunity to de-escalate, e.g., by engaging medical staff or merely waiting a few moments to allow a traumatized person to collect himself. Instead, *they* escalated, forcibly shackling him into the restraint chair while he, quite predictably, tried to resist. Correctional staff decided to keep him in the chair for two hours.

61. In yet another instance illustrating Defendants' punitive approach to mental health disabilities, on **June 11, 2023**, staff at the jail observed "Mr. I" banging his head against a wall while in solitary confinement. Correctional staff handcuffed him, and he struck his head against the wall one more time but was otherwise compliant. In lieu of, for example, moving him away from the wall and engaging medical staff in a de-escalating conversation, or providing Mr. I with medical services, several correctional officers responded with excessive force, strapping Mr. I into

---

[12] Sehu Kessa Saa Tabansi, *From a Pennsylvania prison: The torture chair*, WORKERS' WORLD, Jan. 2, 2017, https://www.workers.org/2017/01/28411/.

a restraint chair.

62. A few months after Mr. G almost succeeded in killing himself by hanging in solitary confinement, there was a nearly identical hanging attempt in the very same cell. **On June 21, 2023**, staff again found someone in their care, “Mr. J”, hanging from the top bunk after being kept in solitary. He had left a suicide note. Upon information and belief, Mr. J had not been adequately screened, monitored or treated by mental health staff, who again failed to identify someone plainly at risk of self-harm. According to an incident report, Mr. J was found only because he had covered his cell window, and staff went to the cell door to investigate. When they cut him down from the bunk, he was not responsive. He was taken to the hospital, where he told medical staff that he was going to keep trying to kill himself until he succeeded.

63. **On September 16, 2023**, “Mr. K”, who was housed in a unit for persons identified as a danger to themselves or others, met with mental health staff. Although he was agitated, mental health staff failed to follow up. Later that day, he tried to kill himself. Mr. K had time to pen a suicide note, place a plastic bag over his head, fasten a noose of bedsheets around his neck, tie the other end to his bunk, and go limp. His serious suicide attempt was discovered by chance when a deputy collecting dinner plates noticed his suicide note and looked into the cell. Staff untied him. He fell to the ground and curled into a fetal position, moaning. He was taken by ambulance to the hospital, where officials acknowledged he was so gravely ill that they sought an involuntary emergency commitment.

64. The following month, **on October 28, 2023**, another suicidal person missed by HCDC screenings, “Mr. L,” managed to tie a sheet around his neck and the bars of his cell near the top bunk, while in solitary confinement on HCDC’s restrictive housing unit and monitored by camera. He was preparing to jump when officers cut him down and proceeded to pin him against

the wall of his cell and handcuff him. Rather than providing counseling or mental health support, mental health staff put him on "suicide watch," in this instance simply returning him to the same cell without any possessions other than his mattress.

65. The trend of monitoring failures allowing suicidal people to injure themselves while purportedly under close observation continued on **April 16, 2024**. "Mr. M" had been at the jail since April 10 on a minor theft charge and was purportedly on "medical observation." HCDC staff saw him upset and crying, pleading for his medication, and aggrieved by the isolation of solitary confinement. A few minutes later, his attempts to hurt himself were caught on video, albeit unseen by his medical "observers". He was repeatedly punching, twisting, bending, and "assaulting" his left wrist, and positioning himself to find ways to smash, kick, or otherwise scrape it against his cell. After several minutes of this, he apparently realized he could use his sheet to hang himself, and he proceeded to spend several more minutes doing exactly that. It was only after staff saw "legs hanging in RHU 4" that they responded. According to HCDC records, most of Mr. M's wellness checks that day were "late." After the incident, Mr. M reiterated that solitary confinement had driven him to self-harm. Although all this information was documented in an investigatory report to senior jail officials, neither Defendant Galbraith nor Gahler took any remedial action to address late checks, inadequate monitoring and observation, or to evaluate how isolation policies were aggravating risk of self-harm. Instead, by their inaction and indifference, they ratified and entrenched the wrongdoing.

66. Less than a month later, on **May 7, 2024**, another shocking death occurred at HCDC, involving a woman purportedly on suicide watch and in withdrawal from opioids. According to a report prepared by the Maryland Medical Examiner, Brittani Ugrotzi was on suicide watch when she died of respiratory failure and dehydration associated with symptoms of her

inadequately-treated opioid withdrawal, sepsis, and COVID. Despite being on suicide watch, and ostensibly subject to 15-minute checks for her well-being, *at least two hours* elapsed between Ms. Ugrotzi's last contact with staff and when she was found unresponsive. Equally horrifying, based on the information available, it is impossible to understand how Ms. Ugrotzi would have progressed to the point of death within two hours. She had been at the jail four days. As her symptoms worsened, she should have received basic medical care and, if necessary, been taken to a hospital for emergency care. Defendants' grossly neglectful "monitoring" likely cost Ms. Ugrotzi her life. Upon information and belief, Defendants took no remedial action to investigate or remedy that the jail let at least two hours pass while purportedly monitoring a gravely ill detainee on suicide watch.

### D. Plaintiff Charles Morris Nearly Died as a Result of Defendants' Willful and Deliberate Indifference.

67. On **August 2, 2024**, while in isolation, Charles Morris tied a noose from his pants and attached it to his upper bunk, stood on his lower bunk, and jumped off. The next time he opened his eyes, he was in the hospital and had been in a coma for three days. Every aspect of Mr. Morris's tragic suicide attempt—missed warning signs, inadequate monitoring and treatment, and solitary confinement in a dangerous cell—follow Defendants' unconscionable, longstanding and un-remediated pattern. Indeed, an HCDC nurse admitted that Mr. Morris should have been placed on suicide watch based on his comments and behavior.

68. During Mr. Morris's initial screening (with HCDC's Felina Talabert, at about 9:50 on the morning of his suicide attempt), Mr. Morris presented clear warnings of crisis, vulnerability to self-harm and psychiatric disabilities. To begin, he had recently been at a residential substance use program. His mother, with whom he lived and for whom he had been a long-term caregiver, recently died. He confided to staff that he was stressed about his ability to cope with all that

emotionally, that he had diagnosed major depressive and bipolar disorders, and that he stopped taking his prescribed psychiatric medications prior to his arrest. He also disclosed that he had previously been prescribed medication for a seizure disorder, and that after he stopped taking that medication two to three months prior, he had suffered a recent seizure.

69. Although Ms. Talabert recorded all this and observed Mr. Morris was "anxious," "visibly depressed," and "tearful,"—notwithstanding that HCDC's own Suicide and Prevention Manual specifically enumerates red flags for suicide that are on all fours with Mr. Morris's screening—Mr. Morris was not flagged for special housing, monitoring, or medical attention necessary and appropriate to his circumstances, in direct violation of HCDC policies. Rather, he was referred for a mental health visit and HCDC staff cruelly isolated him in a cell by himself 23 hours a day.

70. The purported mental health "visit" was just another flyby cell-side screening with Mackenzie Scarff who indicated in her written notes that Mr. Morris was "subdued," "unable to identify any reasons for living," and "overwhelmed." These were major red flags, but further assessment was nevertheless deferred.

71. Four hours later, a mental health staffer, Mercy Obeng, "attempted" to evaluate Mr. Morris by calling him out to a common area, where she observed that he "appeared depressed, and sad (tearful). He sat down with his head bowed down and was reluctant to talk." After answering a question about medication, Mr. Morris stopped answering questions. At that point, it should have been overwhelmingly obvious to the multiple jail staff who had interacted with Mr. Morris that he was in severe psychological distress and at serious risk of self-harm. According to HCDC's own suicide manual, he should have been put on suicide watch with continuous monitoring and offered more mental health support. Instead, like the many others failed by HCDC before him, he was sent

back to his cell that Friday, with no plans for mental health contacts or treatment until Monday.

72. As the evening progressed, Mr. Morris grew increasingly despondent and, like so many before him, came to believe his only option was to end his life, turning to the wholly unnecessary bunk bed in his cell as his means of doing so.

73. Because Mr. Morris had not been provided continuous monitoring, as HCDC's policies for suicidal detainees require, his suicide attempt was not discovered until a deputy (Deputy First Class Parker, Badge #1427) walked by and found him "hanging from detainee striped pants tied around his neck" with the other end "tied to the top corner of the top bunk." The Deputy went in, called a Code Blue for help, and tried to hold Mr. Morris's weight. When other deputies arrived, they cut away the pants and lowered him to the floor. Mr. Morris was not responsive. They could not find any pulse and were forced to begin chest compressions, and then to use a defibrillator. Emergency personnel arrived and transported Plaintiff to Bayview Hospital.

74. Doctors confirmed that Mr. Morris very nearly died at HCDC. Prior to arriving at the hospital, he had suffered a seizure from inadequate oxygen, cardiac arrest, and acute hypoxic respiratory failure upon arrival at the ER, along with wounds to his neck and pain in his chest and leg. The hospital sedated him into a coma and intubated him for approximately three days. Mr. Morris remained in intensive care for nearly a week.

75. While Mr. Morris lay comatose shackled to a hospital bed, at risk of further emergent medical crises at any moment and under the guard of two Sheriff's deputies, Defendant Galbraith improperly tried to hide Mr. Morris's near-death from his sister and next-of-kin, DeVora Jones, a longtime NAACP member who is also a correctional nurse. Egregiously, the warden deliberately refused to contact Ms. Jones, repeatedly claiming to hospital staff, without any reasonable justification, that merely *notifying* the family of Mr. Morris's grave medical condition

would somehow risk the safety of his staff. Callously, he told hospital staff that he would only notify the family in the event of Mr. Morris's brain death.

76. The warden's actions while Mr. Morris was hospitalized subjected Mr. Morris to unnecessary medical risks and violated the law. In addition to other constitutional imperatives relating to the rights of autonomy and close personal relationships, Maryland's Correctional Standards for Adult Detention Centers require the collection of next-of-kin information from detainees upon admission, so that "[i]n cases of death or serious illness/injury of an inmate, the managing official or designee *will initiate contact* with the next of kin identified by the inmate a[t] admission *at the earliest opportunity*."[13]

77. These standards explicitly recognize the commonsense principle that close family members have an important interest in the health and safety of their loved ones, regardless of whether they have been arrested, and that next of kin are a crucial source of vital personal history and other information when someone is incapacitated—for example, deeply held personal wishes about end-of-life decisions. Health and medical decision-making are of vital constitutional significance, and recognized as strong interests that survive arrest and detention.

78. Defendant Galbraith's cover-up thus deprived Mr. Morris's family of the ability to exercise medical judgment on his behalf and to be present as he neared death—a harm of independent constitutional and emotional significance to Mr. Morris, his family, and NAACP members generally.

79. Defendant Galbraith went so far to cover up Mr. Morris's suicide attempt as to unlawfully involve himself in medical consents. When the hospital asked who would make

[13] Department of Public Safety and Correctional Services: Maryland Commission On Correctional Standards, *Adult Detention Centers Standards Manual*, at 35, https://www.dpscs.state.md.us/publicinfo/publications/pdfs/MCCS/STANDARDS%20MANUAL%20-%20ADC-4-2020%20(Revised).pdf. (emphasis added).

medical decisions for Mr. Morris, the warden falsely claimed that, instead of Mr. Morris's actual next of kin, *he* was the decision-maker for medical consents, flouting fundamental constitutional and Maryland law. Nowhere does federal or state law or any Maryland correctional standard authorize a jailer to insert himself as the medical decision-maker for anyone in his custody. It is plainly unethical for jail officials to refuse to contact next of kin in a life-threatening emergency and then insert themselves as medical decision-makers on the grounds that next of kin are not available.

80. Even after his return to HCDC from near-death hospitalization on August 11, 2024, Mr. Morris's ordeal continued through Defendants' use of excessively isolative and degrading conditions under the guise of HCDC's unnecessarily punitive "suicide watch." He was moved from his room at Bayview into an isolation cell at HCDC in handcuffs and shackles. Jail staff required him to remove all clothing other than one pair of thin shorts. It was degrading. He was left practically naked in a cold cell without bedding, except a single blanket. Staff removed every single item of property from the cell—he was left with nothing to read or do except sit alone in the cell and feel miserable under the watch of a surveillance camera. In direct violation of HCDC policy, Mr. Morris was kept in this cell for 23 hours or more each day and cut off from any family contact.

81. Mr. Morris thought he was being punished for his suicide attempt, making him feel "more hopeless," and as if he were being condemned to failure.

82. Mental health nurses checked on Mr. Morris at the doors of his isolation cell, but he did not receive a mental health screening until a full day had passed. At that time, Mr. Morris told mental health staff that he was struggling to cope with the extreme isolation. Over several days, whenever he had an opportunity to speak with staff, Mr. Morris expressed his sense of

profound physical discomfort, isolation, and anguish, begging for additional clothing and blankets and anything that could help him pass the time, such as books.

83. Mr. Morris was also isolated from his family, external support systems, and even other people being held at the jail. Other than a call immediately upon his return to the jail, at least three days passed before he was permitted to make any other call.

84. On August 15, 2024, mental health staff recommended that Mr. Morris be released from suicide watch and returned his personal property. Yet, he remained in solitary confinement until August 19, confined to a cell for 23 hours a day under camera surveillance. Plainly, HCDC knows that this type of solitary confinement is risky and harmful to mental health, given that when transferred to the general population, HCDC placed Mr. Morris on "Do not house alone" status.

85. Throughout Mr. Morris's post-hospitalization confinement, Warden Galbraith personally—not medical staff—exercised decision-making authority over Mr. Morris's property and conditions. On August 11, 2024, upon Mr. Morris's return from the hospital, medical staff noted that, per the Warden, Mr. Morris was to be placed in booking on suicide watch and permitted to wear only shorts. On August 13, 2024, after discussion with the Warden, Mr. Morris was permitted a t-shirt, shorts, two safety blankets, a mattress, a book, and a tablet—but without headphones—pending further assessment. On August 14, 2024, the Warden confirmed that Mr. Morris could also have a uniform shirt and headphones for his tablet. On August 16, 2024, after Mr. Morris requested an additional blanket due to being cold, mental health staff spoke with the Warden, who approved a safety blanket in addition to Mr. Morris's property, which had by then been returned to him without restriction. And on August 19, 2024, mental health staff spoke with the Warden about recommending Mr. Morris for general population, and the Warden agreed that Mr. Morris was appropriate for placement in DSU-Q with a cellmate. These events demonstrates

that Warden Galbraith personally directed and approved, item by item, the property and housing conditions imposed on Mr. Morris in the days following his near-fatal suicide attempt.

86. Mr. Morris's traumatic near-death experience while awaiting his exoneration at trial was completely preventable and could have been mitigated in any number of ways. But Defendants, having failed to self-correct despite years of notice, failed to conduct adequate screening, failed to house him safely, and failed to afford Mr. Morris the monitoring his condition necessitated—all while repeatedly violating their own policies. Because of their failures, to this day, Mr. Morris suffers from the lingering psychological and physical impacts.

87. Shockingly, after Mr. Morris's near-fatal suicide attempt, instead of investigating why HCDC kept nearly killing people in its custody, Defendant Gahler issued a press release celebrating HCDC's success in "saving" Mr. Morris's life and falsely claiming that Mr. Morris "did not present any indications of trying to harm himself."[14]

### E. HCDC Officials at the Highest Levels Ignore and Minimize the Overwhelming Evidence of Risk, Forcing NAACP Officials and Members to Intervene.

88. Notwithstanding this devastating pattern of pain and death, Defendants shrug it off as business as usual, disclaiming responsibility and contending nothing can stem this tide of killing and agony. Not so.

89. As the *Baltimore Banner* reported in February 2024, data show that deaths by suicide at HCDC far exceed those among local jails elsewhere in Maryland and across the country:

[14] News Release, *Harford County Sheriff's Office releases Data on Suicide Rates at the Detention Center*, Aug. 16, 2024, https://harfordsheriff.org/news/releases/hcso-releases-data-on-suicide-rates-at-the-detention-center/.




90. The foregoing data comes from one of two explosive *Baltimore Banner* articles published in February 2024, detailing the appalling pattern of suicides at the jail.[15] Among other things, the *Banner* investigation found that, in addition to HCDC's distressingly high suicide rate, the suicides were "eerily similar" to one another.[16]

91. Even in the face of media scrutiny, Defendants made no changes. The Sheriff responded to the *Banner*'s findings by claiming that other jails cover up suicides and "declin[ed] to address questions and experts' concerns about [HCDC's] use of isolation in the first few days of incarceration."[17] Defendant Galbraith similarly rejected removing the bunkbeds used to isolate newly admitted pretrial detainees, stating, "If I was to take off the top bunk, you'd be eliminating half the bedding space that I have in my jail,"[18] an excuse that defies logic given that those bunkbeds are in cells used for solitary confinement.

92. Defendant Gahler contended that "'[w]e've never had an issue during my tenure with finding that one of our employees did not operate within our policies, or that there was any wrongdoing associated with it[19],'" disavowed responsibility for the medical providers he chooses,

---

[15] *Supra* note 1.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Supra* note 9.

and—while conceding “concern” about a “time check” in one of the five suicides—claimed ignorance and “contended that ‘none of the issues with the checks or the timings’ [of any of the five suicide deaths] ‘had anything to do with Sheriff’s Office personnel.’”[20]

93. Rather than genuinely investigating options to mitigate suicide risk, the HCSO’s approach is to use criminal investigators who are themselves Sheriff’s deputies to determine whether a ***crime*** occurred, rather than determining what could be done to prevent or limit further suffering and losses of life, or whether HCDC violated its constitutional obligations or its suicide prevention policies.

94. Given Defendants’ recalcitrance, the NAACP has taken a variety of actions over many years, culminating in this suit, including repeatedly receiving and responding to complaints and reports concerning suicide, lack of medical and mental health services, and other poor conditions impacting the NAACP, its members, and the community it serves.

95. In January 2023, the NAACP learned that Nathaniel Powell Jr. lost his life at the jail due to Defendants’ deliberate indifference to his medical needs while he languished in solitary confinement. Mr. Powell’s father, Nathaniel Powell Sr., feared that his son had not, in fact, killed himself, but had been hurt by staff at the jail. Egregiously, HCDC never told Mr. Powell about his son’s suicide note; he had to learn about it from a reporter and pursue an intensive administrative process before finally receiving it, with support from the NAACP.

96. Alarmed at the mounting death toll and fearful for their members’ safety, the NAACP organized a February 3, 2023 meeting and tour of HCDC with members of its Legal Redress Committee and Defendants Gahler, Galbraith, and other jail staff. During the visit, it was

[20] *Id.*

noted that the cells for medical segregation were unused at that time, purportedly due to staffing shortages, highlighting the lack of protective options for medically vulnerable individuals.

97. Soon after, however, the NAACP received further complaints about Defendants' continued failure to provide needed medical and mental health services, including a July 29, 2023 complaint from a mother concerned that her daughter had been denied medication for four days while held at the jail; complaints on November 30 and December 1 of the same year from the loved one of a man who reported not receiving medical attention at the jail despite experiencing auditory hallucinations; and an April 23, 2024 complaint seeking support for the relative of an NAACP member, who shared that their requests for medical and mental health support were ignored among other mistreatment while detained at the jail.

98. Members of the NAACP's Legal Redress Committee again toured the jail on June 14, 2024, meeting with Defendants Gahler, Galbraith, and other jail staff about how best to remedy deadly conditions. NAACP members left concerned that HCDC officials were responding performatively while taking no real steps to mitigate the risks to their members.

99. The NAACP received yet another complaint about HCDC on July 4, 2024, cementing their concerns about Defendants' failure to remedy risky conditions. This time, a relative sought help for a man suffering from being reportedly held in solitary confinement upon entry to the jail and denied needed medication. In an email response to outreach by the NAACP on the man's behalf, Defendant Galbraith dismissed the reality of the harmful and well-documented isolation imposed on those awaiting trial, curtly stating "[a]s I had shown you from your previous tour and visits to the Harford County Detention Center, we don't have solitary confinement cells or housing."

100. Less than a month later, NAACP member Charles Morris attempted to take his life at the jail. Even while Defendants tried to cover up his near-death from his family, Sheriff Gahler issued a press release misrepresenting Mr. Morris's suicide attempt and aiming to cast the jail as blameless in any suicide or suicide attempt.

101. In the ensuing months, the NAACP continued to strategize about how it could protect its members, eventually filing a November 2024 public records request seeking more information about suicide attempts that occurred at the jail. The incident reports obtained pursuant to this request confirmed their worst fears: the failures at the jail were even more widespread than they had previously known, and jail officials' claims that there was nothing else to be done were blatantly untrue.

## II. ACTIONS AND INACTIONS OF DEFENDANTS GAHLER AND GALBRAITH AS SUPERVISORS AND FINAL POLICYMAKERS CONTROLLING HCDC HAVE CAUSED THE EXTENSIVE PATTERN OF AVOIDABLE DEATHS, INJURIES AND HUMAN SUFFERING AT THE JAIL

102. Under Defendants Gahler and Galbraith's leadership and control, the jail consistently fails to screen and treat individuals at risk of self-harm; relies excessively on isolation and solitary confinement, which exacerbate suicidality; fails to properly monitor individuals for warning signs of suicidality; houses suicidal individuals alone in cells with unnecessary bunk beds that are frequently used for hanging; fails to monitor people on "suicide watch" and/or "medical observation" and responds to suicidality with degrading and punitive treatment.

### A. Under Defendants Gahler and Galbraith, HCDC has Developed Widespread Practices or De Facto Customs So Permanent and Well Settled That They Function With the Force of Law.

103. As illustrated through the pattern of conduct described in the preceding paragraphs, the duration and frequency of HCDC's unconstitutional patterns, practices, and policies here alleged were, and are, so widespread and persistent within HCDC that they constitute a custom so

pervasive as to have force of law. All of these unconstitutional customs, practices, and policies of HCDC are enabled and in force due to the supervisory authority of the Sheriff and Warden.

104. These de facto customs include HCDC officials failing to adequately screen and monitor for warning signs of suicidality, HCDC's excessive reliance on isolation which exacerbates suicidality, HCDC's routine reliance on remote camera surveillance rather than direct human observation and deficient monitoring of at-risk detainees, HCDC's practice of implementing "suicide watch" through solitary confinement and removal of clothing and property, correctional staff's routine use of excessive force in response to suicidal ideation, HCDC's practice of investigating all suicides and suicide attempts exclusively through HCSO's own deputies, and Defendants' continued failure to remove or modify known unnecessary ligature points in cells used for isolation despite their role in the majority of HCDC's suicide attempts.

105. Sheriff Gahler's written policies further contribute to and permit this unconstitutional pattern and practice. For example, on September 20, 2022, Sheriff Gahler signed and approved a "Housing Assignments" policy providing that those with "a special condition including, but not limited to alcoholism, narcotic addiction, mental health issues, physically disabled … may require separate housing." The "Special Confinement" policy, signed and approved by Sheriff Gahler on November 25, 2020, provides that restrictive housing is "warranted" for "[d]etoxification of an inmate," "[a] physically disabled inmate," and "[a]n inmate needing isolation to reduce agitation." The same provisions were adopted in an updated Special Confinement policy signed and approved by Sheriff Gahler on March 4, 2024. These policies expressly allow and regularize punitive and isolating housing conditions for people with disabilities, mental health issues, and/or substance use disorders.

106. These customs and practices exist and persist because Sheriff Gahler and Warden

Galbraith—as HCDC's final policymakers—have personally contributed to, allowed, tolerated, ratified and failed to correct them. These written and de facto customs were likewise the moving force behind the constitutional injuries alleged throughout this Complaint, including Plaintiff Morris's suicide attempt.

**B. Defendants Gahler and Galbraith's Failures of Leadership Demonstrate Deliberate Indifference, Gross Negligence and Tacit Authorization of Legal Violations at the Jail.**

107. Since at least 2019, as detailed in Paragraphs 45 through 85 above, HCDC has experienced a persistent and escalating pattern of suicides and suicide attempts—including the deaths of Marlyn Barnes, Tommy Pardew, Jack Lazar, Randy Gisiner, and Nathaniel Powell, Jr., and the suicide attempts of Mr. A through Mr. M, as well as Plaintiff Charles Morris—each reflecting substantially similar failures of screening, isolation, and monitoring. Defendants Gahler and Galbraith were personally aware of this pattern through their direct involvement in specific cases, internal investigations, family member and NAACP complaints, NAACP jail tours, and February 2024 *Baltimore Banner* investigative findings and reporting in which Sheriff Gahler and Warden Galbraith were each personally interviewed and responded.

108. Indeed, Defendants, and particularly Defendant Galbraith, has extensive direct involvement in the day-to-day management of the jail. Pursuant to HCSO policies and his responsibilities as warden, Defendant Galbraith is involved in decisions like whether to house a particular detainee in isolation, conditions of suicide watch, and even whether detainees will be transported off site for medical, including psychiatric, care.

109. Warden Galbraith has admitted under oath that when he became warden during the COVID-19 quarantine, he personally observed the enormous adverse effects of isolation on detainees at the jail. Yet, despite this knowledge, as Warden, he has continued to maintain and enforce a policy and practice of isolating pretrial detainees, including detainees with mental health

and substance abuse disabilities making them vulnerable to self-harm, including through his direct involvement in housing decisions isolating individual detainees pursuant to HCSO policies.

110. Despite the deaths and self-harm attempts of numerous detainees and the jail's own internal investigations into those deaths, HCDC has taken no relevant remedial action and implemented no meaningful reforms in response. Instead, when pointedly asked about the policies that have led to these tragic outcomes, Defendants Gahler and Galbraith have evinced an intent to maintain them.

111. When asked by a reporter how the jail addressed a detainee's death that resulted from a known monitoring failure, Defendant Gahler stated only that he could not remember the details, while disclaiming any responsibility for the pain and suffering occurring under his leadership and supervision.

112. Defendant Galbraith likewise rejected calls to remove the upper bunk beds used as ligature points in cells housing newly admitted, at-risk detainees, stating that doing so would "eliminat[e] half the bedding space" in the jail, notwithstanding that those beds are located in cells used for solitary confinement.

113. Rather than investigating whether HCDC's own practices contributed to its pattern of suicides, Defendant Gahler responded to the *Baltimore Banner*'s February 2024 findings by contending that other jails cover up their suicides and by declining to address experts' concerns about HCDC's use of isolation.

114. Specifically, Marc Bullaro, a retired assistant deputy warden at Rikers Island, reviewed HCDC's suicide pattern, flagged that HCDC suicides repeatedly occurred during the first seven days of admission and questioned why detainees booked on minor charges were housed in isolation cells at all, noting that the vast majority of jail suicides occur in single-cell rather than

dormitory-style housing. Terence Keel, a UCLA professor who co-authored a study on jail deaths in Maryland, reviewed HCDC's practices and characterized the combination of unnecessary bunk beds and routine isolation of at-risk detainees as amounting to "incompetence" by HCDC staff. And Dr. Terry Kupers, a forensic psychiatrist who reviewed the pattern of suicides at HCDC, emphasized that detainees with "'any risk at all of suicide' should not be placed alone in a cell," and that "detention centers need thorough, comprehensive mental health screening to determine that risk," calling it "'the number one warning we give jails.'"[21] He concluded that "'something is wrong in this jail.'"[22]

115. Defendants' continued reliance on isolation—despite their admitted knowledge of its adverse effects—and punitive "suicide watch" conditions directly contradict HCDC's own written protocols warning against isolating suicidal detainees; Defendants Gahler and Galbraith know about, and in at least some cases directly order and/or approve, these violations, yet continue to ignore or even publicly defend, praise, and ratify use of these abusive tactics.

116. Suicides and attempted suicides at HCDC requiring investigation are investigated exclusively by HCSO's own deputies, rather than any independent law enforcement agency. Such investigations are conducted by HCSO's Criminal Investigation Division solely for the purpose of determining whether a crime has occurred, rather than mitigating risk of future harm. Sheriff Gahler has personally and publicly defended HCDC's custom of having suicides and suicide attempts investigated exclusively by his own Criminal Investigation Division deputies rather than by any independent agency, stating that "citizens have put their trust in me as the elected sheriff" and rejecting the suggestion that any other entity would be better equipped to investigate deaths at HCDC.

---

[21] *Supra* note 1.
[22] *Id.*

117. According to *Baltimore Banner* reporting, unredacted portions of HCDC's own police reports show that the Sheriff's internal investigations "rarely leveled critical questions at jail staff," who were uniformly cleared of wrongdoing. And the Defendants play a hands-on role in those investigations.

118. HCDC once operated a dedicated behavioral health unit for people struggling with mental illness, but it was discontinued in 2016, during Sheriff Gahler's tenure.

**C. There is an Affirmative Causal Link Between Gahler and Galbraith's Acts and Omissions and the Legal Violations at the HCDC.**

119. Had Defendants established and enforced appropriate policies and practices relating to suicide risk—including removing or modifying the ligature points inherent in HCDC's upper bunk beds in some subset of cells used to house people in isolation, which have been implicated in the vast majority of the facility's suicide attempts—many of the suicides and suicide attempts described above could have been prevented.

120. It was the very systemic abuses perpetrated under Defendants Gahler's and Galbraith's watch—deficient screening and monitoring of new detainees, excessive reliance on isolation, housing of at-risk detainees in cells with unnecessary ligature points, and punitive responses to suicidality, all of which disproportionately impact people with disabilities—that drove Plaintiff Morris to attempt suicide at HCDC.

121. Each element of Defendants' supervisory failures maps directly onto the chain of events leading to Mr. Morris's suicide attempt. First, HCDC's Housing Assignment Policy—personally established and approved by Sheriff Gahler and implemented by Warden Galbraith —directs correctional staff to place detainees presenting mental health or other special needs into solitary confinement; pursuant to that policy and practice, HCDC staff isolated Mr. Morris in a cell by himself for 23 hours a day immediately after intake, despite his disclosed diagnoses of

major depressive and bipolar disorder, recent seizure, and visible distress. Second, HCDC's practice of waiting until a detainee actively self-harms before flagging him as suicidal—rather than escalating to suicide watch upon early warning signs—caused successive HCDC staff members who separately documented Mr. Morris as "anxious," "visibly depressed," "tearful," "unable to identify any reasons for living," and "overwhelmed" to return him to isolation without continuous monitoring or further assessment. Third, Defendants' failure to remove or modify ligature points inherent in HCDC's upper bunk beds—despite personal knowledge, through years of substantially similar suicides and attempts, that those bunk beds were implicated in more than half of the facility's suicide attempts—left Mr. Morris in a cell equipped with the very implement that he used to fashion and secure the noose with which he attempted to hang himself. Fourth, HCDC's practice of substituting periodic cell-side "flyby" screenings and remote camera surveillance for direct, continuous human observation of detainees exhibiting suicide risk meant no staff member was physically present to intervene when Mr. Morris tied a noose from his pants to his upper bunk and jumped. Had Sheriff Gahler and Warden Galbraith not personally adopted, maintained, and enforced these policies and de facto customs which were mutually reinforcing and cumulative in exacerbating risk, and had they taken any basic investigatory or remedial steps, Mr. Morris would not have been isolated in a cell with an unmodified ligature point, would not have been left isolated and unmonitored despite documented red flags, and would not have attempted to take his own life on August 2, 2024.

122. The high rate of needless human suffering and attempted and completed suicides at HCDC is a natural and foreseeable consequence of Defendants Gahler's and Galbraith's failure to take obvious and basic precautions available to them as HCDC's supervisory officials.

123. Defendants Gahler's and Galbraith's supervisory acts and omissions in overseeing

HCDC's operations have been and are carried out by their agents and employees under color of law and are the proximate cause of the ongoing deprivation of Plaintiffs' constitutional rights.

**D. The Sheriff and Warden Failed Adequately to Train and Supervise Employees, Despite the Obvious Risk of Suicides and Evidence That HCDC Practices Result in a High Rate of Suicides Following Similar Patterns.**

124. As set forth above, Sheriff Gahler, in his position of supervisory authority over HCDC's staff, failed to enact or enforce policy, and/or conduct training specific to suicide-risk screening, crisis intervention, and continuous observation protocols consistent with HCDC's own Suicide Prevention and Crisis Intervention Manual, adequate to ensure that people detained pre-trial were properly screened, assessed, housed, and treated to prevent instances of self-harm.

125. Sheriff Gahler and Warden Galbraith have themselves committed—and continue to commit—constitutional wrongs through their deliberate indifference and gross negligence in failing to adequately screen the health needs of detainees, train employees, and supervise operations at HCDC, notwithstanding HCDC's suicide rate of more than five times the national average and the extensive, years-long record of suicides and suicide attempts described above.

126. This failure to train and supervise reflects a knowing establishment and willful maintenance of a system in which individuals entering HCDC are not properly screened for risk of suicide and individuals in Defendants' care and custody are not properly monitored for risk of suicide, thereby enhancing and exacerbating risks of self-harm.

127. Because Defendants' subordinates have repeatedly and systematically engaged in conduct creating an unacceptably high risk of suicide and other self-harm injuries, and because this pattern has persisted for years despite Defendants' actual and constructive knowledge of it, Defendants' failure to train and supervise HCDC staff reflects deliberate indifference to the obvious risk of suicide at HCDC. This failure to train and supervise was likewise the moving force behind the constitutional injuries alleged throughout this Complaint, including Plaintiff Morris's

suicide attempt.

## III. HARFORD COUNTY CONTROLS, FUNDS, AND BEARS LIABILITY FOR FEDERAL LEGAL VIOLATIONS COMMITTED AT HCDC.

128. Harford County is a charter county expressly granted the duty to "establish, maintain, and control" its local jail and "to regulate all individuals confined [therein]." Md. Code Ann., Local Gov't § 10-304(a), (c). Harford County's Charter expressly permits the County to delegate its authority over the detention center to agents, and here it has delegated this authority to the Sheriff, Warden and their deputies, who operate HCDC. Harford County fully funds the jail and all of its operations, and is financially responsible for legal violations occurring there, including those alleged by Plaintiffs in this lawsuit.

### A. Pursuant to Harford County's Charter and Relevant Law, the HCDC, the Sheriff, Warden and All Jail Staff Are Treated as and Act as County Agents and Employees.

129. Under applicable Maryland State and Harford County law, Sheriff Gahler, Warden Galbraith, and the deputies whose conduct is at issue in this case bear all the hallmarks of being County agents for purposes of operating the detention center.

130. As a matter of State and County law, the Sheriff and Warden are final policymakers for Harford County at HCDC. As a Charter ("home-rule") county, Harford County is expressly granted the duty, under Maryland state law, to "[e]stablish and maintain ***local correctional or detention facilities*** and juvenile facilities" and to "[r]egulate all individuals confined in the facilities." Md. Code Ann., Local Gov't § 10-304(c) (emphasis added).

131. In its Charter, Harford County reserved for itself the full authority permitted home rule counties under state law. Harford County Charter, Art. I, Section 101 (Dec. 7, 1972) ("County Charter") (Harford County "shall have all rights and powers of local self-government and home rule as are now or may hereafter be provided or necessarily implied by this Charter and by the

Constitution and laws of the State of Maryland. The County shall have all such rights and powers as completely as though they were specifically enumerated in this Charter and no enumeration of rights or powers in this Charter shall be deemed exclusive or restrictive.”).

132. In short, Maryland granted, and Harford County assumed, authority to establish and control a local detention facility. And Harford County promptly did so: Harford County adopted its Charter in 1972, and HCDC opened in 1973.

133. Moreover, Harford County’s Charter expressly permits the County to delegate its authority over the detention center to an agent like the Sheriff: “[t]he powers mentioned in the preceding section shall be exercised only by the County Council, the County Executive, and other officers, agents, and employees of the County acting under their respective authorities.” County Charter, Art. I, Section 102. And that is precisely what Harford did—it delegated authority to operate HCDC to the Sheriff. The HCSO’s Administrative Policy regarding Organizational Structure, issued August 25, 2021, states that the “HCSO provides a wide range of law enforcement and correctional services within Harford County, including … pretrial and post-trial detention[.]”[23] The Sheriff, Warden and Deputies are the final repository of Defendant Harford County’s authority over the detention center. As sworn officers conducting correctional activities, the Sheriff and his deputies are also obligated to act primarily for the benefit of Defendant Harford County and act according to law.

134. Given the foregoing, including the express provisions of the Harford County Charter, Harford County is liable for the operation of its detention center and the constitutional violations at issue in this lawsuit. *See Dotson v. Chester*, 937 F.2d 920, 928 (4th Cir. 1991) (“We have no doubt but that sheriffs are final policymakers for counties when operating jails in charter

[23] https://harfordsheriff.org/ wp-content/uploads/2018/05/ADM0201-Organizational-Structure.pdf (last accessed April 1, 2026).

counties.").

135. Sheriff Gahler's approval and defense of the conduct alleged, rendered with full knowledge of its unconstitutional character, constitutes ratification by Harford County's final policymaker within the meaning of *Monell*. Because Sheriff Gahler's ratification communicated to HCDC staff that the practices described throughout this Complaint—including reliance on isolation, deficient screening and monitoring, housing in cells with unnecessary protrusions, and the absence of any corrective response to prior deaths and near-deaths—would continue without consequence, that ratification was itself a moving force behind the ongoing constitutional injuries alleged in this Complaint, including Plaintiff Morris's suicide attempt.

136. Also as a matter of State and County law, Harford County is responsible for funding the Sheriff, the Warden, and the HCDC. The Sheriff's Office is fully funded by the County, with an annual operating budget of nearly $120 million, including close to 700 salaries, as well as funds designated to further support "health services" and "transportation needs, mental and substance use treatment as well as employment opportunities and additional community referrals."[24] Indeed, when HCDC needs to change or modify its budget, it seeks approval from the County; Warden Galbraith has testified that he has had "hard conversations with the county executive, with the county council… to increase [HCDC] funding."

137. Defendant Harford County controls the appointment and compensation of sheriff's deputies: "[t]he Sheriff shall appoint the number of deputies at the compensation provided in the county budget." Md. Code, Cts. & Jud. Proc. § 2-326(d). In Harford County, law enforcement and

---

[24] 2022 HARFORD SHERIFF ANNUAL REPORT, 5-6, 20 (2022); Matt Hubbard, *"[Harford County Executive Robert] Cassily Proposes 'Fully Funding' Public Education And Sheriff's Office In FY 2026 Budget*," Apr. 18, 2025, Baltimore Sun, https://www.baltimoresun.com/2025/04/18/cassilly-proposes-fully-funding-harfords-public-education-and-sheriffs-office-in-fy26-budget/ ("The $133.5 million Cassilly provided for the sheriff's office is a $7 million increase over this year's budget.").

corrections officers "have the right to organize and negotiate with the Harford County Executive and the Sheriff with regard to wages and employee health care premium share not regulated by the Sheriff." *Id.* at (i)(2), (j)(2).

138. Defendant Harford County is also responsible for furnishing offices and paying operating expenses for the Sheriff, Md. Code, Cts. & Jud. Proc. § 2-313(c), and is the primary source of funding for detention operations and training. Harford County, Md., Bill No. 22-016 (signed June 23, 2022, effective August 22, 2022) borrowed funds for the detention center's operations and training, including $20.5 million for the Sheriff's Office Central Precinct and Training Facility and $2.04 million for Detention Center Facility Repairs and Upgrades.

139. The Fiscal Impact Note to Bill Number 25-005 shows the Sheriff's Office receiving $34,016,369 in fiscal year 2024 from the County for "provid[ing] local correctional services," out of an overall Sheriff's Office budget of $116,066,631 from the County—covering the Wage Package, medical services, food service, safety equipment, supplies, weapons and ammunition, the 'Self-Insurance Fund' (which covers judgment costs for cases such as this one), and funds for behavioral health, substance abuse services, high-risk inmate medical monitoring, job re-entry training, and inmate transport assistance.

140. Beyond its operating budget, the County owns, maintains, and insures the Detention Center and all Sheriff's Office precincts and facilities, purchases and maintains all Sheriff's Office equipment and vehicles (including fuel), and provides services through County agencies, including Human Resources for benefits administration and the Department of Law for litigation representation.

141. Harford County is also responsible, as a matter of State and County law, for the regulation of the conduct of the Sheriff and Warden. Defendant Harford County works with the

HCSO to review policies and practices and provide risk management/incident review, workers' compensation, and related advice and counsel.

142. Among other things, the County has implemented commissions such as the Harford County Police Accountability Board, the Police Commission, and the Harford County Administrative Charging Committee, which exercise practical authority and control over the operation of the Detention Center. Indeed, Defendant Harford County has explicitly appointed the Sheriff to serve as the chair of the Police Commission.

143. Under Harford County Code, Chapter 9, Part 3, Article XXII (§ 9-136), Harford County established the "Harford County Police Accountability Board," as authorized under Title 3 of the Public Safety Article of the Annotated Code of Maryland. "Members shall be appointed by the County Executive for terms coterminous with the County Executive and shall be confirmed by the County Council." *Id.* Further, "[t]he County Executive shall appoint, subject to a confirmation by the County Council, a member to serve as the Chair of the Board." *Id.* The Board's "responsibilities and duties," include, "quarterly meetings with the heads of law enforcement agencies…to improve matters of policing"; "[r]eceiv[ing] complaints of police misconduct filed by members of the public;" "[a]ppoint[ing] civilian members to administrative charging committees and trial boards;" and "[m]ak[ing] recommendations on changes to policy that would improve police accountability in the County." *Id* § 9-138.

144. Similarly, the "Police Commission" created and regulated by Harford County Code, Chapter 9, Part 2, Article III, has the power to "formulate recommendations to the County, state and municipalities regarding," *inter alia*: "[u]niform standards of performance and standardized operating procedures," "[i]n-service training programs as required by the Maryland Police Training Commission and as recommended by the chief law enforcement officer of Harford

County," and "[u]pdating, planning and coordination of law enforcement policy changes." Through this Commission, Harford County maintains actual control and authority over the Sheriff, Warden and the Deputies who work at the Detention Center. The Sheriff is explicitly designated Chairman of the Police Commission. *Id.* § 9-8, § 9-9.

145. Under Harford County Code, Chapter 9, Part 3, Article XXIIA, the County established and regulates the "Harford County Administrative Charging Committee" for the purpose of "review[ing] the investigative files submitted by the appropriate law enforcement agency and mak[ing] a determination regarding administrative charging in accordance with the Public Safety Article of the Annotated Code of Maryland," and, "[o]n completion of the investigation by the appropriate law enforcement agency, … review[ing] the investigation and determin[ing] whether the officer shall be administratively charged or not administratively charged." *Id.* § 9-142(A), (I). If administrative charges are filed, the Committee must then make a disciplinary recommendation. *Id.* § 9-142(J). The "Harford County Administrative Charging Committee" includes, "[t]wo civilian members selected by the County Executive." *Id.* § 9-140(C). Through this Committee, Harford County maintains actual control and authority over Defendants Gahler and Galbraith in addition to the Deputies who work at the Detention Center, including the ability to charge and discipline them.

146. The County Treasury Funds the HCDC in its entirety, and will be responsible for paying any judgment awarded.

147. Under Maryland law, when "any sheriff or deputy sheriff" performs "detention center functions," including "operating and administrating a detention center" and "supervising personnel" associated with the detention center, the county is liable: "[a] county or Baltimore City may obtain insurance to provide the coverage and defense necessary under the Maryland Tort

Claims Act," and if the county "does not obtain adequate insurance coverage to satisfy the coverage and defense necessary under the Maryland Tort Claims Act," then the remainder of the liability may be seized by the State from tax revenue or be subject to a warrant for payment. Md. Code, State Fin. & Procurement §§ 9-108(a)(2), (b); 9-108(c) & (d).

148. Consistent with this statutory framework, the Harford County treasury is responsible for satisfying any judgment that may be awarded against the Sheriff and the Warden in connection with the constitutional violations alleged in this Complaint. Maryland's State Government Article separately provides that "[t]he duties, responsibilities, and liabilities of the State under this subtitle for a tort claim shall be assumed by the applicable county,"[25] further confirming that Harford County bears financial responsibility for tort liability arising from the operation of HCDC.

149. In 2024, the Maryland General Assembly passed Senate Bill 793, which the Governor approved and which became law on May 9, 2024, expressly stating the Legislature's intent that "counties bear responsibility for all matters related to the performance by sheriffs and deputy sheriffs of a county . . . for 'law enforcement functions' and 'detention center functions.'"

150. In practice, the County's control and fiscal responsibility for the HCSO has meant the County pays judgments and settlements to resolve legal claims against the Sheriff and his deputies, sometimes even over objections of the Sheriff. For example, in 2024 the County paid a million-dollar settlement – through its insurance and county funds – to the family of John Fauver, a man killed by HCSO deputies, notwithstanding Sheriff Gahler's vehement opposition. Likewise, in 2014, the County joined with the State in paying a settlement against the Sheriff's office for injuries William R. Harvey incurred as a result of a reckless high-speed chase by Harford Sheriff's

[25] Md. Code Ann., State Gov't § 12-103.3.

deputies.

### B. The Operation of the HCDC Primarily Implicates Local Concerns.

151. Maryland law delegates the authority to establish local correctional facilities to counties, and HCDC, in turn, houses people arrested or convicted in Harford County, is funded largely by Harford County taxpayers, and is operated and staffed by a locally elected Sheriff and his appointed warden.

152. The Sheriff is electorally independent of the State, as he is locally elected and hence answerable to the local populace rather than the state-wide electorate, and the Warden, in turn, is appointed by the Sheriff.

153. Indeed, the Local Government Insurance Trust ('LGIT'), the insurer and legal representative for many counties and municipalities in Maryland, publicly advises that in counties such as Harford "where the sheriff performs law enforcement and/or detention center functions, ***it is virtually conceded that the sheriff and his deputies are county agents***."[26] This, LGIT explains, is because "the functions they perform are local and the duty to defend does, and should, rest with the county."[27]

## IV. THE STATE AND COUNTY ARE JOINTLY AND SEVERALLY LIABLE FOR HCDC VIOLATIONS OF THE ADA AND REHABILITATION ACT

### A. The HCDC Fails to Accommodate Persons, Such as Mr. Morris, Subject to Disabilities.

154. As alleged above, Mr. Morris is a qualified individual with a disability under the ADA and the Rehabilitation Act, diagnosed with major depressive and bipolar disorders and a seizure disorder, and also temporarily disabled by suicidality while at HCDC.

---

[26] See Breads, J., "The Legal Relationship Between Counties and Sheriffs – Past, Present and Future", at p.5 (emphasis added), available at https://www.lgit.org/DocumentCenter/View/1854/LOVE-YOUR-LOCAL-SHERIFF?bidId= (last visited Mar. 25, 2026).

[27] *Id.*

155. As alleged above, Defendants State of Maryland and Harford County each qualify as a "public entity" under Title II of the ADA and as a program or activity receiving federal financial assistance covered by the Rehabilitation Act, and are therefore subject to the requirements of both statutes.

156. A public entity must make reasonable modifications when it has knowledge of a detainee's physical or mental limitations, and that knowledge need not arise from an express request for accommodation; it is sufficient that the need for accommodation was obvious or apparent from the detainee's statements, behavior, or presentation.

157. As alleged above, HCDC staff had actual knowledge of Mr. Morris's obvious need for accommodation: during his intake screening, he disclosed his diagnoses of major depressive and bipolar disorder, his recent seizure, and his inability to cope with his mother's recent death, and staff observed him to be anxious, visibly depressed, and tearful—presentations that HCDC's own Suicide Prevention and Crisis Intervention Manual identifies as red flags for suicide risk.

158. As alleged above, Mr. Morris's need for accommodation became still more apparent over the course of the day, as successive HCDC staff members separately documented that he was "subdued," "unable to identify any reasons for living," and "overwhelmed," and later observed him as depressed, sad, tearful, and unresponsive to further questioning.

159. Despite this actual and obvious knowledge, HCDC failed to make any reasonable modification to accommodate Mr. Morris's known limitations: it did not flag him for special housing, enhanced monitoring, or medical attention, and instead isolated him in a solitary cell for 23 hours a day with no plan for further mental health contact until after the weekend, as alleged above.

160. As alleged above, an HCDC nurse later admitted, in retrospect, that Mr. Morris

should have been placed on suicide watch based on his comments and behavior, confirming that HCDC possessed the knowledge necessary to trigger its duty to accommodate his known disability-related limitations, yet failed to do so.

**B. The HCDC's Policies and Practices Disparately Impact Persons With Disabilities, Like Mr. Morris.**

161. At least ten incidents are described above—including those involving NAACP members Mr. Morris and Mr. Powell—in which Defendants improperly failed to identify someone at risk of self-harm due to their deficient practices and training, resulting in needless suffering, injury or death.[28]

162. These incidents often involve people with known and documented mental health needs, substance-use disabilities, or psychiatric history—including detainees experiencing drug or alcohol withdrawal, depression, and other diagnosed conditions—and Defendants' failures to identify suicide risks fall disproportionately to people with disabilities. Moreover, Defendants' isolation and housing practices exacerbate risk of harm for people with disabilities.[29]

163. The ADA requires public entities to "ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

164. Here, HCDC denies people with disabilities equal access through facially neutral policies, including but not limited to its Housing Assignment Policy, Special Confinement Policy, and Health Care Services Policy, by: failing to make reasonable modifications to those policies, such as measures to mitigate disabled individuals' greater vulnerability to the well-documented harms of isolation; failing to ensure equal access to suicide precautions by requiring people with

[28] *Supra* ¶¶ 53-77, 79-99.

[29] *Supra* ¶¶ 41-50, 56, 60, 65, 77.

disabilities to expressly state an intent to self-harm; failing to communicate effectively with people with disabilities—such as, for example, failing to ensure suicidality screenings or purported monitoring of people to account for differences in how people with disabilities may be able to communicate; and otherwise denying equal access to safe housing through the compounded harms of inadequate screening and training; and disproportionately subjecting people with disabilities to excessive uses of force.

### C. The HCDC Subjects Persons With Disabilities, Such as Mr. Morris, to Disparate Treatment.

165. In fact, Defendants treat people with disabilities *worse* because of their disabilities, particularly after suicide attempts. For example, Defendants punish people for symptoms of their disabilities by subjecting them to excessive isolation, force and degrading conditions.[30]

166. The disabilities that HCDC punishes include not only mental health diagnoses, such as bipolar disorder, depression, and opiate use disorder, that are associated with increased risk of suicide and vulnerability to the harms of isolation, but also suicidality itself, which can be a temporary disability giving rise to ADA/Section 504 claims because it substantially limits major life activities within the meaning of those laws for so long as the suicidality continues. This is true regardless of which underlying condition (e.g., depression, anxiety, PTSD, substance abuse) may be contributing to that crisis.

167. Defendants have adopted unfounded pejorative stereotypes about people at risk of self-harm that prevent them from treating people safely.[31]

168. Accordingly, Defendants' disability-based mistreatment described above—including of people with psychiatric, substance use, and suicidality-related disabilities—

[30] *Supra* ¶¶ 61, 69, 72, 92-95.

[31] E.g., "[i]f somebody wants to kill themselves, they're determined and they've made their mind up, they're going to find a way," *Supra* ¶ 3.

establishes disparate treatment.

## CAUSES OF ACTION

### COUNT I
**Fourteenth Amendment to the U.S. Constitution and 42 U.S.C § 1983**
**Deliberate Indifference to Unconstitutional Conditions of Confinement**
**Exacerbating Risk of Suicide and Deprivation of Serious Medical Needs**
(All Plaintiffs Against Defendants Jeffrey Gahler and Daniel Galbraith
in Both Their Official and Individual Capacities)

169. Plaintiffs incorporate and reallege the allegations of all preceding paragraphs.

170. By their policies, practices, acts, omissions and deliberate indifference to the harms described herein, Defendants Gahler and Galbraith, as supervisors, final decision and policy makers in control of operations at the Harford County Detention Center, have engaged in—and overseen their agents and employees in engaging in—an unlawful pattern and practice of willfully subjecting Plaintiffs, their members, and loved ones to substantial risk of serious mental harm, physical injury, suffering and death through abusive conditions of confinement and constitutionally inadequate medical care at the Harford County Detention Center. Pursuant to controlling law in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), these Defendants' supervision, oversight, endorsement, disregard and tacit authorization of the longstanding and continuing pattern and practice of deliberate indifference to the serious medical needs of persons in their custody, care and control at HCDC, including Plaintiff Charles Morris and Harford NAACP members, is legally actionable under the Fourteenth Amendment and 42 U.S.C. § 1983, given the affirmative causal link between Defendants' supervisory failures and the harms suffered by Plaintiffs, including the deprivation of Mr. Morris's and his family's independent constitutional interest in family notification and medical decision-making during his hospitalization, as alleged.

171. As set forth above, Defendants Gahler and Galbraith had actual and constructive knowledge that their subordinates were engaging in conduct posing a pervasive and unreasonable

risk of constitutional injury, and their response to that risk was so inadequate that it shows deliberate indifference, gross negligence and tacit authorization of their subordinates' constitutional violations. As alleged above, Sheriff Gahler and Warden Galbraith had actual knowledge of the specific unconstitutional conduct underlying each of the constitutional violations described in this Complaint, including the circumstances of each death at the jail, the *Baltimore Banner*'s February 2024 findings regarding HCDC's suicide rate and use of isolation, and Plaintiff Morris's near-fatal suicide attempt. Rather than meaningfully investigating disavowing, correcting, or disciplining that conduct, Sheriff Gahler affirmatively approved and defended it as consistent with HCDC policy and practice and rejected any possible need for improvement. In this way, they ratified their subordinates' unconstitutional conduct by publicly approving and defending it after specific suicide attempts and deaths.

172. Through their supervision and control of the Harford County Detention Center, its agents and employees, Defendants Gahler and Galbraith have created and entrenched an unlawful policy, practice and custom of failing to adequately protect or provide adequate care for individuals at risk of suicide, primarily persons held pretrial, among those in their custody. Rather than protecting against risks or providing appropriate and necessary care to vulnerable detainees, Defendant and its agents instead knowingly engage in practices that together *heighten* suicide risks and result in needless pain, suffering and death among people incarcerated at HCDC and their loved ones. This includes by:

a. Failing to properly screen individuals for risk of suicide;

b. Failing to properly monitor individuals at risk of suicide;

c. Placing individuals at risk of suicide in solitary or other isolated confinement, in violation of HCDC's own written policies;

d. Isolating individuals at risk of suicide in cells with superfluous upper bunk beds

creating implements for suicide;

e. Responding to suicidal ideation with punishment rather than treatment, thereby exacerbating the risk of harm;

f. Ignoring their own incident reports documenting repeated, similar suicide attempts while seeking to cover their failures and wrongdoing by falsifying records and denying information and access to family and loved ones of those harmed in their facilities, including Plaintiffs;

g. Investigating suicides and suicide attempts exclusively through HCSO's own deputies rather than an independent entity; and

h. Vesting a non-clinical custodial official with decision-making authority over the housing and treatment of psychiatrically vulnerable detainees.

173. As set forth above, including facts demonstrating the affirmative causal link between Defendants' supervisory failures and Plaintiff Morris's suicide attempt, Defendants Gahler and Galbraith know or should know of these risks, have failed to correct them, and have thereby caused the harms alleged above to Plaintiff Morris and NAACP members.

174. To the extent Defendants Gahler and Galbraith are determined to be state officials for purposes of this claim, as alleged above, Plaintiffs seek prospective injunctive and declaratory relief against them in their official capacities pursuant to controlling law as set forth in *Ex Parte Young*, 209 U.S. 123 (1908). This claim challenges Defendants' ongoing enforcement of the specific, non-discretionary written policies and de facto customs described above—including HCDC's Housing Assignment Policy, Special Confinement Policy, and Health Care Services Policy—and not any exercise of individualized discretion, and therefore constitutes an ongoing violation of Plaintiffs' Fourteenth Amendment rights properly subject to injunction under *Ex Parte Young*, as enforced through 42 U.S.C. § 1983.

175. Additionally, to the extent Defendants Gahler and Galbraith are determined to be state officials for purposes of this claim, Plaintiffs seek monetary relief against them as supervisory

defendants pursuant to controlling law as set forth in *Hafer v. Melo,* 502 U.S. 21 (1991), for their violations of Plaintiffs' rights under the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983.

**COUNT II**
**Fourteenth Amendment to the U.S. Constitution and 42 U.S.C § 1983**
**Deliberate Indifference to Unconstitutional Conditions of Confinement**
**Exacerbating Risk of Suicide and Deprivation of Serious Medical Needs**
(All Plaintiffs Against Defendant Harford County)

176. Plaintiffs incorporate and reallege the allegations of all preceding paragraphs.

177. By its policies, practices, acts, omissions and deliberate indifference to the harms described herein, Defendant Harford County – through its agents, including its final policy makers Sheriff Gahler and Warden Galbraith – has adopted an unlawful pattern and practice of willfully subjecting Plaintiffs, their members, and loved ones to substantial risk of serious mental harm, physical injury, suffering and death through abusive conditions of confinement and constitutionally inadequate medical care at the Harford County Detention Center, which the County funds and operates. Pursuant to controlling law as set forth in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), Harford County's years-long, continuing pattern and practice of deliberate indifference to the serious medical needs of persons in its custody, care and control, including Plaintiff Charles Morris and Harford NAACP members, is legally actionable under the Fourteenth Amendment and 42 U.S.C. § 1983.

178. The cumulative effect of Defendant's failures, which serve no legitimate penological purpose, pose unacceptably high risks of, and have actually caused, significant mental and physical suffering.

179. Defendant, its agents and policymakers operating HCDC, know or should know of the grave risks their practices pose to people in pretrial detention, given the warnings inherent in

the egregious record of suicides and self-harm among people in their care. In failing to heed these warnings by taking corrective measures, and by continuing to engage in a policy and custom in violation of detainees' due process rights and HCDC's own policies, Defendant and its agents and policy makers who control and operate the jail, directly caused harm to a long line of people in their care, including Plaintiff Charles Morris, his loved ones, and other NAACP members.

180. Even after identifying people at risk in their care, Defendant and its agents fail to take adequate steps to protect against self-harm through deficient suicide protocols by subjecting those at risk to unnecessarily dangerous and harsh conditions in violation of their own policies and established correctional standards, putting them in punitive conditions more extreme than HCDC disciplinary segregation, and even using excessive force.

181. These Harford County policies and practices, acts and omissions have been, and continue to be, carried out by Defendant, its agents and employees under the color of law, and are the proximate cause of Plaintiffs' ongoing deprivation of rights secured by the Fourteenth Amendment to the U.S. Constitution.

182. Defendant's failure to protect and denial of adequate care to people in the County's custody at the HCDC are the result of an objectively unreasonable response to substantial risks of suicide and pretrial detainees' serious medical needs, and causes the unnecessary, wanton infliction of pain and suffering, and denial of substantive due process to Plaintiffs, in violation of the Fourteenth Amendment to the U.S. Constitution, as enforced through 42 U.S.C. § 1983.

183. Harford County's acts and omissions have caused Plaintiff NAACP's members to suffer, and will cause them to continue to suffer irreparable injury, including physical injury, mental and emotional distress, and even death.

## COUNT III
## Article 24 of the Maryland Declaration of Rights

**Gross Negligence Creating Unconstitutional Conditions of Confinement Exacerbating Risk of Suicide and Deprivation of Serious Medical Needs**
(All Plaintiffs Against Defendants Jeffrey Gahler and Daniel Galbraith)

184. Plaintiffs incorporate and reallege the allegations of all preceding paragraphs.

185. Through their policies, practices, acts, omissions and deliberate indifference to the harms described above, Defendants Gahler and Galbraith, have engaged in an unlawful and grossly negligent pattern and practice of willfully subjecting Plaintiffs, their members, and loved ones to substantial risk of serious mental harm, physical injury, suffering and death through abusive conditions of confinement and constitutionally inadequate medical care at the Harford County Detention Center, which these Defendants supervise, control and operate. Defendants' years-long, continuing pattern and practice of gross negligence respecting the serious medical needs of persons in its custody, care and control at HCDC including Plaintiff Charles Morris and Harford NAACP members, is legally actionable under the Article 24 of the Maryland Constitution, pursuant to controlling law as set forth in *Barbre v. Pope*, 402 Md. 157 (Md. App. Ct. 2007). Md. Const. Decl. of Rts. Art. 24.

186. Defendants Gahler and Galbraith had actual and constructive knowledge of the risks posed by their conduct and that of their subordinates', but responded with deliberate indifference, gross negligence, and tacit authorization of that conduct. Specifically, Defendants Gahler and Galbraith engaged in the same unlawful policy, practice, and custom of failing to protect individuals at risk of suicide described in Count I above, which Plaintiffs incorporate here by reference.

187. Defendants' supervisory failures and Plaintiff Morris's suicide attempt, Defendants Gahler and Galbraith know or should know of these risks, have failed to correct them, and have thereby caused the harms alleged above to Plaintiff Morris and NAACP members.

**COUNT IV**
**Americans with Disabilities Act Title II**
(All Plaintiffs Against State of Maryland and Harford County)

188. Plaintiffs incorporate by reference the allegations of all preceding paragraphs.

189. Defendants State of Maryland and Harford County each qualify as a "public entity" as defined under Title II of the ADA. *See* 42 U.S.C. § 12131, 28 C.F.R. 35.104. As such, these Defendants jointly share responsibilities for compliance with the ADA and its implementing regulations, including by establishing adequate practices and procedures to safely care for and house people with disabilities in their custody and ensuring compliance.

190. Plaintiff Charles Morris and other NAACP members, past and present, qualify as individuals with a disability as defined by the ADA, including during the time of their incarceration at the Harford County Detention Center.

191. Although Harford County and the State of Maryland are responsible for safely caring for and housing people with disabilities in their custody, they routinely fail to meet these obligations at the Harford County Detention Center. That is, Defendants:

a. have failed to properly care for and safely house people with disabilities in their custody at HCDC;

b. have failed to establish and enforce adequate practices and procedures to care for and house people with disabilities safely, including effective communication in assessing suicide risk and accessing mental health treatment;

c. have failed to provide adequate education or training to leadership and personnel staffing the Harford County Detention Center in how to keep individuals with disabilities in their custody safe from self-harm; and

d. have responded to distress expressed by people with disabilities punitively, resulting in exacerbation of the suffering and risks of self-harm experienced by those in Defendants' custody.

192. Specifically, Defendants State of Maryland and Harford County have discriminated against, punished, and failed to safely care for and house people in their custody–including

Plaintiff Charles Morris and other NAACP members–because those individuals have disabilities, including but not limited to physical disabilities, cognitive disabilities, mental health or psychiatric disabilities, substance use disabilities, and/or suicidality associated with mental health crises and/or addiction withdrawal. Instead, Defendants operate HCDC in a manner that has and continues to exacerbate those risks of harm to and *lack* of proper and safe care and housing for people with disabilities who are detained there, in violation of Title II of the ADA.

193. Defendants' failure to safely care for and house HCDC detainees with disabilities in violation of the ADA has caused grave harm to Plaintiff Morris and to NAACP members.

**COUNT V**
**Section 504 of the Rehabilitation Act of 1973**
(All Plaintiffs Against State of Maryland and Harford County)

194. Plaintiffs incorporate and reallege the foregoing paragraphs.

195. Due to mental health conditions, Plaintiff Charles Morris and other NAACP members qualify as individuals with a "disability" as protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.4.

196. The Rehabilitation Act dictates that no otherwise qualified individual with a disability be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance because of her disability. *See* 29 U.S.C. § 794(a).

197. Upon information and belief, the State of Maryland and Harford County receive federal financial assistance and are, therefore, covered by the Rehabilitation Act.

198. As alleged in Count IV above, which Plaintiffs incorporate by reference, Defendants State of Maryland and Harford County have failed to safely care for and house, and have discriminated against, people with disabilities in their custody at HCDC, including Plaintiff Charles Morris and other NAACP members because of their disabilities.

199. Defendants' failure to safely accommodate HCDC detainees with disabilities in violation of the Rehabilitation Act has caused grave harm to Plaintiffs Charles Morris and to other NAACP members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and grant the following:

A. Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants have failed and continue to fail to protect Plaintiffs and their members against the serious risk of substantial harm of suicide at HCDC, as guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article 24 of the Maryland Declaration of Rights;

B. Declare, pursuant to 28 U.S.C. § 2201, that through their acts and omissions, Defendants have violated and continue to violate the Americans with Disabilities Act and the Rehabilitation Act of 1973;

C. Grant such equitable relief as is proper and just to ensure compliance with the U.S. and Maryland Constitutions and ADA and Rehabilitation Act, including but not limited to, requiring Defendants to immediately take steps to remedy the practices noted in this Complaint;

D. Award compensatory damages to Plaintiff Charles Morris in an amount to be determined by the jury, jointly and severally, against Harford County, Sheriff Gahler in his individual capacity, and Warden Galbraith in his individual capacity;

E. Award nominal damages of $1 to Plaintiff NAACP jointly and severally, against Harford County, Sheriff Gahler in his individual capacity, and Warden Galbraith in his individual capacity;

F. Award all Plaintiffs reasonable attorneys' fees, expert witness fees and costs under 42 U.S.C §§ 1988 and 12205, against all Defendants, jointly and severally; and

G. Award such other and further relief in any form that this Court deems just and proper under the facts and circumstances as proved at trial.

**JURY DEMAND**

Plaintiffs request a trial by jury on any and all issues raised by this Amended Complaint which are triable by right of a jury.

Dated: August 5, 2026

Respectfully submitted,

*/s/ Katherine M. Bleicher*
Katherine M. Bleicher (Bar No. 19870)
Alex C. Lakatos
Vionna J. Moore
Katherine F. Aragon*
Gabriela N. Dueñas Acevedo
Mecca R. Aikens
Jaspreet K. Momi*
Mayer Brown LLP
1999 K Street NW
Washington, District of Columbia 20006
Tel.: 202-263-5282
KBleicher@mayerbrown.com
ALakatos@mayerbrown.com
VMoore@mayerbrown.com
KAragon@mayerbrown.com
GDuenas@mayerbrown.com
MAikens@mayerbrown.com
JMomi@mayerbrown.com

Sonia Kumar (Bar No. 07196)
Deborah A. Jeon (Bar No. 06905)
Gina Elleby (Bar No. 32059)
Dara Johnson (Bar No. 31478)
American Civil Liberties Union of Maryland
3600 Clipper Mill Road, Suite 200
Baltimore, Maryland 21211
Tel.: 410-889-8555
kumar@aclu-md.org
jeon@aclu-md.org
elleby@aclu-md.org
djohnson@aclu-md.org

Leslie Faith Jones*
Madeleine Gates (Bar No. 31508)
Washington Lawyers' Committee for Civil Rights
and Urban Affairs
700 14th St NW Suite 400
Washington, District of Columbia 20005
Tel.: 202-319-1000
lesliefaith_jones@washlaw.org
madeleine_gates@washlaw.org

**pro hac vice admission pending*